[Crim. No. 5926. Second Dist., Div. Three. Aug. 26, 1958.]

THE PEOPLE, Respondent, v. ALBERT TEITELBAUM, Appellant.

Morris Lavine for Appellant.

Edmund G. Brown, Attorney General, and Herschel T. Elkins, Deputy Attorney General, for Respondent.

NOURSE, J. pro tem.*—Appellant having been convicted on both counts of an indictment charging him in count I with conspiracy to commit grand theft, attempted grand theft, and the filing of a false and fraudulent insurance claim in violation of section 556, Insurance Code; and in the second count with the violation of section 556 of the Insurance Code

*Assigned by Chairman of Judicial Council.

(the presentation of a false and fraudulent claim for the payment of a loss under a contract of insurance and the preparation and making of a writing with intent to present the same in support of such claim) appeals from the judgment and an order denying his motion for a new trial.

In the indictment Clifford Vanderwyst, also known as Weiss, and one Claude Wilson were named as coconspirators. At the opening of the trial, appellant's motion that he and Wilson be tried separately, was granted and after the jury was impaneled the People dismissed the action as against Weiss pursuant to the provisions of section 1099 of the Penal Code. The indictment was not dismissed against Wilson until after appellant's motion for a new trial was denied.

The facts as shown by the evidence offered by the People are: About 7 p. m. on December 27, 1955, the police were called to appellant's place of business as a result of an A.D.T. alarm. After appellant had related the details of a robbery[1] Captain Huff of the Beverly Hills Police Department asked the appellant:

"Al, besides the furs, was there anything else taken, either your money or Stan's money, or some of the company's money?" And the appellant replied: "No, nothing else. They seemed to know exactly where to go and what to do."

On the 28th of December, and prior to an inventory being taken of the furs in the fur vault, the appellant reiterated the fact that nothing but furs had been taken.

Appellant was insured against theft in three companies, the total amount of insurance being the sum of $350,000.

A Mr. Gaebel was an insurance adjustor representing the three insurers.

Following the alleged robbery there were prepared under the appellant's direction, two lists of the furs alleged to have been missing. These did not purport to be accurate but were subject to correction; they were furnished to the Beverly Hills Police Department. In the first week of February, 1956, the appellant stated to Gaebel that he had finally completed a list of the furs stolen in the robbery. The appellant offered this list to Gaebel. Gaebel asked that it be mailed to him together with a number of copies. A few days later Gaebel received by messenger, 10 copies of this list. This list (People's Exhibit No. 10) contained a description of in excess of 280 fur garments with a statement after each, of its value. It was not

---

[1]What he related in this regard was not testified to.

signed. On February 8th, officers of the Beverly Hills Police Department stated to appellant that they had been advised that Gaebel had the final list and asked appellant if that was the "whole works" and stated to him that inasmuch as it did not have the manufacturer's numbers of the garments on it, it was of no use to the police. The appellant stated that the list, Exhibit Number 10 was the final list for the insurance company and was not for the police department, and if they wanted a copy of it they could get it from one of the insurance companies.

About February 10th, Weiss surrendered himself to the Beverly Hills Police. Prior to 9 a. m. on February 14th, an officer of the Beverly Hills Police Department picked up the appellant and an employee of appellant's by the name of Somper, at appellant's place of business in Beverly Hills, telling them that they had under arrest a man they were informed had "pulled your robbery" and that they would like to have the appellant look at him and see if he could be the man. On arrival at the police station, appellant and Somper were separated and Somper was placed under arrest. The appellant was taken into a corridor, at the end of which was a cell in which Weiss was seated. The officer accompanying appellant, asked appellant if he could identify Weiss. Appellant answered that Weiss was of the general build and description but he was not positive. By prearranged plan, the officer then left the area, leaving appellant and Weiss alone. They were, however, in the view of another officer who was peering through an aperture in the wall. As soon as appellant and Weiss were alone, Weiss motioned the appellant to approach him. Appellant made no verbal reply but made a motion, placing the forefinger of his right hand vertically against his lips and then held his right arm against his body and moved it away from his body, making this motion several times.

Appellant then left the corridor and rejoined the officer who had accompanied him (Lt. Borders). At this time he was placed under arrest and was immediately taken to the office of the chief of police where there were present, in addition to appellant, Weiss, Chief of Police Anderson, Lieutenant Borders and Captain Huff Appellant was again asked if he was positive he had not seen Weiss and appellant replied: "I told you upstairs I never seen him. . . . It looks like the man. They are general in build but he is not the man."

Weiss was then asked if he had seen appellant before. He replied that he had at appellant's fur store on the night of the alleged robbery when he talked to appellant in his office.

In response to questions by Lieutenant Borders, Weiss in the presence of appellant, stated that he had met one Woody Wilson in the first part of November through a person known as Billy Layton; Layton had told him that he had a friend who was looking for someone to pull a phoney robbery; Wilson told him that he had a furrier friend who wanted to pull a phoney insurance bit, that it was a walk-in walk-out proposition where no one would get hurt; on November 30th he (Weiss) and Wilson had, pursuant to a prearranged plan made by Layton, gone to appellant's fur store with the understanding that there would be but one employee present, who would be expecting to receive some packages; they carried with them two suit boxes and they were admitted to the store by a colored employee; it was Weiss's job to hold this colored employee while Wilson went into the vault to move the furs from one part to another; they were not successful because when they arrived at the store a colored woman was also there, who started to scream and the colored man ran for the alarm button, whereupon Wilson and Weiss fled; Wilson had contacted him after Christmas, stated that the date would be December 27th and that the colored man had been sent out of town; Wilson told him he should go to appellant's store at 10 minutes to 6 where he would be met by appellant in the front of the store and that appellant would carry the ball from there on; he was instructed to represent himself as an insurance agent and to talk about insurance policies when he went into the store; he did go to appellant's store at 10 minutes to 6 p. m. and pretended to identify himself and appellant took him into his office; there he and appellant talked about fur auctions and appellant left the office and came back with a large mink coat stating that "They can't close the vault until I get this back;" appellant again left the office and came back and whispered: "The office help is leaving;" thereafter a woman stuck her head in the door and stated that she was leaving for the day; he pointed to his watch and remarked that it was 6:25 and said: "It's too late to take it now;" appellant replied: "No, I had the A.D.T. set up from 6:30 to 7:00 o'clock;" immediately thereafter, appellant called to a man by the name of Stan and asked if everybody had gone; Stan answered: "Yes;" appellant said to Weiss: "Get ready;" he, Weiss, then removed from the briefcase that he

carried, some gloves and a toy pistol; appellant then told Stan to come in and when Stan came to the door of the office, appellant said: ''Stan this is a hold-up. We are insured. Don't start anything;'' thereafter he directed Teitelbaum to tape Stan's arms behind him and appellant did; they marched Stan to a closet where he was left on the floor; they then went into a corridor on the south side of the building and appellant directed him to go back and close the door to the closet where they had left Stan; after doing this, he proceeded to the fur vault where appellant was arranging furs ''vacating racks and moving them to another position;'' he asked appellant if he could help but was told to go and look out the back window; he did and shortly thereafter appellant came to where he was standing and took him to the rear door and opened it, told him to go out that way when he left; they then proceeded to a closet and that appellant gave him a secretary containing some money; he asked appellant how much it contained and he said ''$2,500.00'' in $100 bills; appellant also gave him a watch and told him to put it in his pocket; he then took appellant to a closet on the south side of the building and taped him and then left the premises by the rear door.

Borders then said to appellant: ''Al, that's the story. Is it true or not?'' Appellant answered: ''Yes, it was a stupid thing.'' Borders then asked appellant if he would like to tell his side of the story and he said: ''No, I will wait until my attorney gets here.''

Appellant was not advised that he was entitled to a lawyer or that he had a right not to be present when Weiss was questioned, or that anything he said might be used against him.

The People did not offer any direct testimony that no promise of immunity was made to appellant prior to the occurrence in the office of the chief and that no threats had been made against him or any force or violence used upon him, but the evidence did disclose, without contradiction by appellant, each act and occurrence which took place between the time the appellant was picked up at his store and the interrogation of Weiss in appellant's presence in the office of the chief.

At the trial, the accomplice Weiss testified that at 5:50 p. m. on December 27th, 1955, he entered the appellant's fur shop carrying a tan briefcase; he was dressed in a blue shadow-striped suit, and wore horn rimmed spectacles and a gray hat; the brim of the hat was turned down in front and he kept his

head down so that his face could not be seen so well; when he entered the store there were some girls there and the appellant; he was stopped by one of the girls and he asked to see Mr. Albert Teitelbaum; he showed them a secretary and said he was from an insurance company; the appellant jumped up and came over to him and he gave appellant a name which he could not remember; he and appellant went into appellant's office and sat there until 6:25 or 6:30 p. m. During the time they were there, they discussed fur auctions and appellant talked in an average voice; while he and appellant were sitting in the office, appellant left the room and came back with a full-length black mink coat which he showed him and stated that they would have to leave the vault open; he asked the appellant how long he should stay there; the appellant answered that the A.D.T. would not come on until 7 o'clock that night; he took gloves and a toy pistol out of his briefcase, put on the gloves and held the pistol pointed at the appellant; at that time all of the employees except Al Stan had left the premises; appellant called Stan into the office. When Stan came in, he (Weiss) had the pistol pointed at Teitelbaum and told Stan if he did not follow Mr. Teitelbaum's instructions that they would both get hurt; Teitelbaum taped up Stan and they walked him into a little cubby hole on the north side of the building and made him lie down; he and appellant then walked back to the office and toward the fur vault and appellant told him to go back and close the door on Al Stan, which he did; he then went over to the fur vault and stepped inside and asked appellant if he wanted him to help to rearrange the furs; that appellant replied that he did not, and so he walked back to near the office; when he went into the vault, appellant was rearranging the furs; while waiting for appellant to come out of the fur vault, he looked out of the back window into the alley and saw somebody walking from the parking lot toward the back end of the store; this person turned down the alley and out of sight, but the same party came back and went into the parking lot and got into a car and pulled out; appellant came back from the fur vault and gave him a brown secretary with $2,500 in it and a wrist watch. This took place in the back end of the store; the appellant then said that he, Weiss, was to tie him up and they went into an alcove on the south side of the store where there was a big rack and appellant sat down on the floor and straddled his legs around the steel bar of the rack; he taped appellant's feet around the bar and appellant then put his hands around

the bar and he, Weiss, taped his hands; he asked appellant how he was going to get loose and he said he would get loose when the A.D.T. came when no buzzer rang; he then went out of the back door carrying the briefcase which contained the remainder of the adhesive tape and the toy pistol; he threw his gloves in the trash can at the edge of the building; he took nothing with him from this store that he had not brought in except the watch and the wallet with the money in it; at the time appellant handed him the $2,500 and the wrist watch, he asked appellant if all the money was there and appellant answered: "See Woody;" he knew a person who had the nickname of "Woody" and that that person was Claude "Woody" Wilson; he threw the wrist watch that the appellant gave him, away at about Olympic and La Cienega, someplace in that district; that that was about 6:45 p. m.; after leaving the fur shop he met Woody and gave him $1,000 to give to William Layton.[2]

Weiss further testified that he voluntarily surrendered himself to the Beverly Hills Police station and was placed in a cell there; on the third or fourth day after he surrendered he saw the appellant at the station; at that time he was in a cell; there was a hallway or corridor leading to this cell; when he first saw appellant, Lieutenant Borders was with him; the lieutenant asked appellant if he could identify the witness; that appellant said that the witness was of the general build and description but he was not positive; Lieutenant Borders walked out of the area and that he, the witness, motioned the appellant to come over to his cell; after he had made this motion, the appellant placed his fourth finger of the right hand across his lips; appellant also twice made the motion with his hand commencing near his person and then extending it away from his person;[3] after this occurrence he was taken to Chief Anderson's office. On cross-examination the witness admitted having been convicted of a number of felonies.

The witness Walge testified: that on December 27, 1955, he

[2]The People attempted to question the witness relative to the occurrence on November 30, 1955, which the witness had described in the statement made in the presence of the appellant in the office of Chief Anderson, but objections of the appellant to this testimony were sustained on the ground that there was no proof of the existence of a conspiracy at that time.

[3]Weiss's testimony as to the gesture made by himself and appellant was corroborated by the witness Cork, who observed this occurrence through an aperture in the wall of Weiss's cell.

was employed as a chauffeur by Mario Lanza and that on the early evening of that day, he drove Lanza into the alley in the rear of appellant's fur store. It was then between 6:30 and 7 o'clock, and dark. He parked his car in the lot to the rear of appellant's store and that there were two other cars there, a station wagon and a white Oldsmobile. These he knew to be the property of appellant. He saw no other vehicles; after parking he got out of the car and knocked on the rear door of Teitelbaum's store. He knocked several times and that Lanza got out and they both knocked. There were lights inside the store but there was no response to their knocking; Lanza pounded upon the metal rain cover of the door with a palm frond; the witness then walked around to the front of the store and although the lights were on, he could not see anyone in the store; he knocked upon the window; he then returned to the parking lot and drove the car with Mr. Lanza and one Esther Collins, around to the front of the store; he then got out of the car and walked to the front of the store and knocked on the window but there still was no response; he returned to the car and while waiting in the car, he was facing the front of the store and saw several faces in a three-way mirror; the car was parked diagonally, facing the front of the store; on seeing these faces, he got out of the car and walked back to the window and knocked again and at that time appellant and Al Stan were walking toward him. They came within 10 feet of where he was standing outside of the window; appellant was in the lead as he and Stan came down a narrow passage and that as appellant came toward him he made "this motion like this, which I assume was, Get out of here, or—Go away." (This gesture was described by the court as follows: "the witness placed both palms shoulder height near his body and moved them away from his body two or three times;") that after this happened Lanza got out of the car and Stan opened the door and admitted Lanza and locked it again. The witness returned to the car and sat down and shortly after, Stan came back and opened the door and admitted Lanza and Collins.

The People further proved that after the return of the indictment here, the appellant made a claim against an insurance company other than one of those that covered the furs in his store, for the loss in the alleged robbery of a wrist watch of a claimed value of $500.

On behalf of the defense, Al Stan testified that he is the appellant's uncle, having been employed by the appellant for

many years; a little after 6 o'clock on December 27th he was called into appellant's office and was met by a man with a .45 automatic; he knew it was a .45 automatic because he had had experience with them while in the police reserve; the man with the gun told him to put his hands behind his back and told appellant to bind them with adhesive tape; the tape broke a couple of times and when it would the man with the gun poked appellant with it; he then told him to walk forward and the appellant to follow him; they took him into a closet where the man with the gun told him to lie down and then told appellant to bind his legs with adhesive tape, which appellant did; he was not bound to anything; he was unable to state how long he was in the closet[4] but that he did get into a sitting position and freed himself from the tape; while in the closet he heard nothing going on outside until he heard a pounding upon the back door; he then opened the closet door and found the appellant standing on the other side of the door; he was positive Weiss was not the man with the gun; the man with the gun was about as tall as Weiss but a little heavier, probably 15 pounds heavier; the man with the gun looked like Orson Welles did 20 years ago. He further testified that the man with the gun was wearing horn rimmed glasses.

Eleanor Eldridge testified that she had been employed by the appellant for eight and a half years; between 5:30 and 6 o'clock on the evening of December 27th, 1955, she was sitting on the sofa in the appellant's place of business next to appellant, and that there was also present another employee named Treitler and a customer named Hebard; a few minutes before 6 a man came in the front door of the store; she could not remember whether or not he had on a hat. Her recollection was that he wore a dark suit, she thought it was brown; the man said he wanted to discuss insurance with Mr. Teitelbaum and Mr. Teitelbaum invited him into his office; she left the premises about 6:15 by the rear door; her car was parked in the parking lot; she backed out and it was very dark; as she backed out she saw a truck which was parked on the wrong side of the alley; it was a van type truck, parked without lights; she related seeing this truck on being questioned by the police. She further testified that she was in the fur vault many times on December 27th, the last time about 5:30 on that

<hr />

[4]On cross-examination he admitted testifying before the grand jury that he was in the closet 15-20 minutes and that he then believed that estimate was correct.

day; at that time none of the racks was empty; she next entered the fur vault in the early afternoon of December 28th and at that time there were several empty racks; about half the racks were empty; that it was customary to keep the furs about two to three inches apart on the racks.

She testified that Weiss was not the man whom she saw enter the store at about 6 o'clock on the 27th; the first time she ever saw Weiss was in the Beverly Hills police station on the 14th of February; she went there with Police Officer Cork and Mrs. Brodkin; she and Mrs. Brodkin were taken to a room where Weiss was sitting; Weiss was then handcuffed in front and was asked by the officer to pull his hat down; Weiss was then wearing a blue pin-striped suit; the officer then asked Weiss to identify the women but he was unable to do so except on direct questioning as to their identity.

The witness Brodkin testified that she was employed by appellant as a bookkeeper; that sometime after 6 on the evening of December 27, 1955, she left her place of employment and at that time saw a man sitting with Mr. Teitelbaum in his office. She did not get a good look at him, only the back of his head. She said she was taken to the station on the 14th of February by Officer Cork. She there saw Weiss who had his hat on, and was asked to pull his hat down in front, which he did; but neither she nor Mrs. Eldridge was asked to identify Weiss; it was Officer Cork and not Lieutenant Borders who took her in to see Weiss.[5]

A number of other witnesses testified that on the 27th day of December 1955, there were no empty racks, but on the 28th there were many empty racks; their estimation as to the number of furs missing being from 50 per cent to 90 per cent.

The appellant also introduced the testimony of accountants, whose testimony, based upon the records of the appellant, showed that a large number of furs which had been purchased by, or consigned to appellant prior to December 27th, were unaccounted for and missing on December 28th.

The appellant took the stand on his own behalf but was not examined as to any matters other than the occurrences in the office of the chief of police on February 14th. He testified that at the beginning of the conversation in which Weiss related his story under the questioning of Lieutenant Borders, he interrupted with the statement that Weiss was a "damned liar" and interrupted them on several other occasions during

---

[5]Both Cork and Borders testified to the contrary.

the course of Vanderwyst's interrogation and was told by the chief of police to keep quiet. That on one occasion he stated Weiss' story was "a lot of hokum." He denied that at the end of the interrogation of Weiss, Borders said to him: "Al, that's the story. What about it?" and denied that he said "Yes, it was a stupid thing."

Appellant asserts that the grand jury which returned the indictment against him was not legally constituted and that therefore the indictment was void, and the superior court was without jurisdiction to try him under it.

The grand jury which returned the indictment here was selected through a procedure provided by rule 16 of Rules of Superior Court of the County of Los Angeles. (See McKinney, New California Digest, vol. 1A, pp. 175-176.)

 Appellant's contention that the jury was illegally constituted, is premised upon the invalidity of this rule as being in violation of the provisions of the Code of Civil Procedure as to the qualifications of grand jurors and as to the mode of their selection. Appellant does not contend that any of the grand jurors was an unqualified person, nor does he assert that there was any exclusion from the panel from which the grand jury was selected of persons of his race, religion, area of residence, political persuasion or any other condition which conceivably would be of detriment to him.

In substance, rule 16 provides as follows:

The grand jury shall be drawn and impaneled each calendar year in the Master Calendar Department of the Criminal Division of the court. On or before the first Monday in November of each year, each judge shall place in the hands of the presiding judge as *nominees*[6] for the grand jury for the ensuing year, the names of two persons whose age, residence and occupation shall be stated and who are personally known to the judge submitting such names, and who have no affiliations known to the nominating judge which would preclude them from serving with complete impartiality if chosen, and who are legally qualified to act as grand jurors. The presiding judge shall cause a copy of the entire list of nominees to be placed in the hands of each judge of the court and copies furnished to the press, and shall cause the list to be filed with the secretary of the court and open to public inspection. That the presiding judge shall appoint a "committee on grand jurors" to whom objection to any nominee may be commu-

---

[6]All emphasis herein is ours unless otherwise noted.

nicated by any judge or other person. The names of the members of this committee shall be published with the list of nominees. Each judge shall make an investigation of the prospective grand jurors and may communicate to the committee on grand jurors his objections to any nominee. Any judge nominating a person as a prospective grand juror may withdraw the name of his nominee.

On or before December 31st, the committee on grand jurors shall present the presiding judge with a written report concerning each nominee. It shall set forth therein all objections received from any judge to any nominee. Before the 10th of January the presiding judge shall call a meeting of the judges. At that meeting the report of the committee on grand jurors shall be presented to and considered by the judges, and those nominees who are approved by a majority of the judges shall constitute the grand jury list, and this list shall be filed with the county clerk and made a public record.

Appellant attacks this rule upon the following grounds: (1) That the rule violates sections 204b and 204c of the Code of Civil Procedure in that it does not provide for the preparation of a list of qualified and competent persons by the jury commissioner and (2) that the rule violates the provisions of sections 198 and 199 of the Code of Civil Procedure in that it requires grand jurors nominated to be personally known to the nominating judge. (3) That the requirement of the rule that a person nominated by a judge shall be personally known to him, constitutes a systematic and illegal exclusion of a large segment of the people of the county as grand jurors. These contentions cannot be sustained.

The power and the duty of the superior court as to the selection of grand jurors is set forth in section 204 of the Code of Civil Procedure. So far as pertinent here, that section reads: ''In the month of January in each year it shall be the duty of the superior court in each of the counties of this State to make an order designating the estimated number of grand jurors . . .; and immediately after said order designating the estimated number of grand jurors shall be made, *the court* shall *select and list the grand jurors required by said order* to serve as grand jurors in said superior court during the ensuing year, . . . and said selections and listings shall be made of men and women suitable and competent to serve as jurors, as set forth and required in Sections 205 and 206 of this code, . . .''

''In counties and cities and counties having a population

of 80,000 inhabitants or over, such selection shall be made by a majority of the judges of the superior court; . . ."

By section 204a, the majority of judges of a superior court in counties having a population of over 60,000 *may* appoint a jury commissioner *"to assist* the judges thereof in making selections of . . . grand jurors." By section 204b it is made the duty of the jury commissioner "pursuant to written rules or instructions adopted by a majority of the judges of such court" to furnish the judges of the court a list of persons qualified to serve as grand jurors. Section 204d provides that pursuant to the rules and instructions adopted by a majority of judges of the court, the jury commissioner shall return to the judges a list of persons recommended by him for jury duty, but further provides that the judges shall not be bound to select any names from said list, but may, if in their judgment "the due administration of justice requires, make all or any selections from among the body of persons in the county . . . suitable and competent to serve as jurors regardless of the lists returned by the jury commissioner."

Sections 204a and 204b and 204d in no wise affect or limit the duty of judges of the superior court to select and list the persons from which grand jurors shall be drawn pursuant to the provisions of sections 209 and 211 of the Code of Civil Procedure. They do not require, but merely authorize the appointment of a jury commissioner. They do not require that a jury commissioner, if appointed, must take any part in the selection of the list of persons to serve as grand jurors, but merely authorize the judges of the court to request his assistance if they are so advised and to adopt rules to guide him in the performance of his duty if it be required of him.

The Superior Court of Los Angeles County did appoint a jury commissioner but it did not require of him any assistance in the selection of the grand jury list, but chose to perform these duties without the assistance of the jury commissioner.

Rule 16 constitutes merely the procedure adopted by a majority of the judges of the court to govern them in carrying out, in an orderly manner, the duties imposed on them by section 204, and the power to adopt such a rule cannot be doubted.

The provisions of the rule that a judge shall only nominate a person personally known to him, for consideration by a majority of the judges, is not mandatory but must be

construed as advisory only, as the judges could not by rule control the action of any individual judge upon a matter addressed to his discretion. But assuming that it is mandatory and that no judge could legally submit for consideration the name of a person not personally known to him, it still does not contravene any statutory provisions as to the selection of grand jurors, for the persons selected must not only be personally known to the judge, but must, by the provisions of the rule, be legally qualified to act as grand jurors and therefore must be persons who meet the requirements of sections 198 and 199 and 205 of the Code of Civil Procedure. There is nothing in section 204 that requires that the prospective grand jurors be selected at random from the body of the county. Further, the list of nominees does not constitute the grand jury list. That list is only constituted when a majority of all of the judges have approved the names to be contained upon the list.

Appellant places great reliance upon the case of *Bruner* v. *Superior Court,* 92 Cal. 239 [28 P. 341]. It has no application here. In that case the person who summoned the jury to act on a special venire from which the grand jurors were to be selected, had no power to act, the order appointing him elisor being void. Here there is no question of the power of the judges to act, but to the contrary, they were the only persons who could act.

 During the examination of the witness Gaebel it was developed that during the time the grand jury was in session and considering the evidence produced before it, as the result of which it returned the indictment here, one of the grand jurors, during a recess in the grand jury proceedings, requested certain information from the witness Gaebel; Gaebel procured a certain document, handed it to a secretary at the rooms where the grand jury was in session and she in turn handed it to the juror. It was stipulated that such a document is not one of those incorporated in the transcript of the grand jury proceedings which was furnished to the appellant. It was further stipulated, at the proceedings had upon the appellant's motion under section 995 of the Penal Code, that more than 12 of the grand jurors voted for the return of the indictment.

It is appellant's contention that the failure to include the document furnished to the grand juror in the record of the grand jury proceedings deprived him of the right given him by section 995 of the Penal Code, to a full and complete

transcript of all of the proceedings before the grand jury. There is no merit in this contention.

There was no evidence that any of the grand jury, other than the one to whom it was furnished by the witness Gaebel, ever viewed the document, or that it was considered by the grand jury in returning its indictment. There was no proof that it was a part of the record. It is presumed that the law was obeyed and that all evidence received before the grand jury was incorporated in its record. (Code Civ. Proc., § 1963, subds. 15 and 33.)

Assuming that all of the grand jurors examined the document outside of the formal proceedings and without it being introduced in evidence, still that fact would not affect the validity of the indictment or the jurisdiction of the court to proceed under it, for the evidence received before the grand jury and contained in the record of its proceedings was sufficient to uphold it. (*McFarland* v. *Superior Court*, 88 Cal. App.2d 153 at 158-159 [198 P.2d 318].)

There was, however, no proof that any grand juror, other than the one to whom the document was handed, examined it, and as it was stipulated that more than 12 jurors voted to return the indictment, the perusal of the document by one could in no event void the indictment.

There is no showing made and in fact no claim made by appellant, that failure to incorporate the document in question in the record of the proceedings of the grand jury, adversely affected him in preparing for trial. The document was not produced at the trial and the appellant was therefore not called upon to meet any probative force that it might have had.

Appellant further asserts that count I of the indictment was insufficient to state an offense against the laws of the State of California in that it failed to set forth the name of the person upon whom the theft was conspired to be committed and the amount involved, or set forth the false and fraudulent claims filed or the amount alleged to have been claimed.

He further asserts that count II of the indictment fails to state a public offense in that it failed to name the insurers or to set forth the claims made.

Both counts of the indictment fully meet the requirements of section 950 of the Penal Code. If there was any uncertainty in either count or if the second count as claimed, charged two crimes without separately stating them, which it did not,

any such deficiency was waived by the appellant by failing to demur to the indictment. (*People* v. *Pierce*, 14 Cal.2d 639 at 643-646 [96 P.2d 784] ; *People* v. *Yant*, 26 Cal.App.2d 725 at 729-730 [80 P.2d 506] ; *People* v. *Brac*, 73 Cal.App.2d 629 at 734-735 [167 P.2d 535].)

During the trial of this action which consumed nearly three weeks, conferences were held at the bench, out of the hearing of the jury on 26 occasions, and eight conferences were held between court and counsel in chambers. In addition, other off-record conferences were held at the bench. As no affidavits were filed on the motion for new trial that these concerned matters involved in the trial of the action, we assume they did not. Appellant, though in the courtroom, was not present at any of the conferences between court and counsel at the bench, nor was he present in chambers during the proceedings there.

Appellant asserts that by reason of the fact that the conferences between counsel and the court, out of the presence of the jury, were not heard by the members of the public who attended the trial, he was denied a public trial as guaranteed by section 686 of the Penal Code and by article I, section 13 of the Constitution of this state. He further contends that proceedings had at the bench and in chambers, when he was not personally present were in violation of his right to appear and defend the action in person as guaranteed by section 1043 of the Penal Code and by the article of the Constitution of this state last mentioned.

We find no merit whatsoever in the contention that the trial was not a public one. No member of the public was barred from the courtroom or from the proceedings had during the time the jury was entitled to be present and to itself hear the proceedings. We have carefully scrutinized the transcript as to each of the occurrences of the 34 conferences which we have mentioned above and find that in each instance the matters as to which the conferences were had between court and counsel, were matters which could not have been properly heard in the presence of the jury. In each instance the subject matter of the conferences between court and counsel was a question or questions of law, and not matters advanced for consideration of the triers of fact.

The trial of the action, so far as the term "public trial" is concerned, consists in the proceedings for the impanelment of the jury, the opening statements of counsel, the presentation of evidence, the arguments, the instructions to the

jury and the return of the verdict, and from none of these proceedings was the public excluded. Thus appellant was not denied a public trial.

Neither appellant nor counsel made any objection to the conferences at the bench or those in chambers and many of them were held at the request of appellant's counsel. Appellant thus waived the right he now claims, to have the public present at those conferences. (*People* v. *Tugwell,* 32 Cal.App. 520 at 525-526 [163 P. 508].)

Appellant's contention that his absence from the conferences at the bench and in chambers deprived him of his right to be present at the trial and to defend, cannot be sustained. The absence of the appellant from the conferences held between court and counsel at the bench and in chambers did not, under the circumstances here, deprive him of any rights given him by the provisions of article I, section 13 of the Constitution "to appear and defend, in person and with counsel," or his right given him by section 1043 of the Penal Code to be personally present at the trial. In none of the instances of conferences at the bench or in chambers, were any matters presented to the court as to which appellant could have been of any aid to his counsel. Each of them concerned questions of law as to the admissibility of evidence and any knowledge appellant may have had of the facts which his counsel did not have, would have been of no aid to his counsel in the presentation of these questions of law.

In our opinion the rights of an appellant under section 1043 of the Penal Code or under article I of section 13 of the Constitution are not violated unless he is prevented from being present during the presentation of matters before the triers of fact or such other times as his absence would thwart a fair and just hearing.

In considering the appellant's right to be present at a trial under the provision of the Fourteenth Amendment to the Constitution, Mr. Justice Cardozo in *Snyder* v. *Massachusetts,* 291 U.S. 97 [54 S.Ct. 330, 333, 78 L.Ed. 674, 90 A.L.R. 575], said in part: "Nowhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow. . . . So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent

only.''[7] In *United States* v. *Johnson,* 129 F.2d 954 at 959 [144 A.L.R. 182], the court said: ''The test, therefore, the jury, the triers of fact being absent from the courtroom, must be whether or not the appellant was damaged by not being present. . . . The question which was argued was purely one of law . . . the trial court correctly resolved it. . . . As we have previously indicated, the right of a defendant to be present when the triers of fact are absent is not an absolute right, but one qualified by a condition that nothing occurs when he is not present which could put him in jeopardy. Only thus would his presence bear a relation 'reasonably substantial, to his opportunity to defend.' ''

There is no reason why any different interpretation should be placed upon the statutes or provisions of our Constitution above mentioned than is placed by the Supreme Court of the United States upon the Fourteenth Amendment.

■■■■ Appellant has failed to point out any occurrences had out of his presence which in any way affected him adversely and our own study of the record convinces us that his rights were not substantially impaired. As a matter of fact the appellant was not excluded from conferences held at the bench or in chambers. No order was made excluding him. He was, at the time of the trial, on bail and not under restraint and was free to, of his own volition, attend any of such conferences. He made no attempt so to do. His absence was of his own volition and not by reason of any action of the court and by failing to personally assert, or to assert through his counsel, his desire to be present, he waived his right to be present. (*People* v. *Tugwell,* 32 Cal.App. 520, 525, 526 [163 P. 508] ; *People* v. *Searle,* 33 Cal.App. 228 at 232 [164 P. 819] ; *People* v. *White,* 20 Cal.App. 156 [128 P. 417] ; *People* v. *Rogers,* 150 Cal.App.2d 403 at 413, 415 [309 P.2d 949] ; *Snyder* v. *Massachusetts,* 291 U.S. 97 [54 S.Ct. 330, 333, 78 L.Ed. 674 at 678, 90 A.L.R. 575] ; *Deschenes* v. *United States,* 224 F.2d 688.)

■■■■ Appellant asserts that the trial court erred in denying his motions to strike the testimony of the witness Borders, wherein that witness testified as to the statements made on the 14th day of February 1956, in the office of the chief of police, by Weiss in the presence of the appellant and wherein he related that appellant had, at the end of the interrogation of Weiss by Borders, stated in answer to the witness Border's

---

[7]Quoted with approval, *People* v. *Isby,* 30 Cal.2d 879 at 894 [186 P.2d 405].

question as to whether the statements of Weiss were true:
"Yes, it was a stupid thing."

They first assert that this adoptive confession was received without any foundation being laid for it, in that, so they assert, there was no evidence offered that the statement was free and voluntary. It is seemingly appellant's position that because no witness was asked as to whether any force or violence was used, or promise of immunity or reward made, that a proper foundation was not laid for the receipt into evidence of the alleged confession. Appellant, however, has not cited any authority to uphold this contention nor have we, in our research been able to discover any cases which require such direct testimony in order that a proper foundation may be laid for the receipt of a confession, although we recognize that it is the common and probably the better practice to produce such testimony before offering the confession. We are satisfied that the evidence was sufficient to make it a question of fact for determination, first by the trial court and then by the jury, as to whether or not the confession was voluntarily given and to uphold the finding that it was voluntary.

The evidence discloses everything that occurred from the time the appellant was picked up at his place of business on the morning of the 14th of February, 1956, until the time appellant admitted the truth of Weiss' statements, and nowhere in the evidence is there any indication of any threats, force or violence or promises of immunity or reward. The appellant, when he took the stand did not assert that any violence had been used upon him or threats made to him or promises of immunity or reward given him. Under the evidence here, the question of whether the confession was voluntary was one to be determined by the trial court and the jury. (*People* v. *Chan Chaun,* 41 Cal.App.2d 586, 590-591 [107 P.2d 455] ; *People* v. *Burwell,* 44 Cal.2d 16 at 30-32 [279 P.2d 744].)

The fact that the appellant was under arrest and that his confession was made in response to questions asked by the officers while he was under restraint, does not, in and of itself, prove that his confession was not free and voluntary, but was merely a circumstance to be taken into consideration by the trial court and jury in determining that question. (*People* v. *Rogers,* 22 Cal.2d 787, 805 [141 P.2d 722] ; *People* v. *Bigelow,* 104 Cal.App.2d 380 at 390 [231 P.2d 881] ; *People* v. *Chan Chaun, supra*; *Rogers* v. *Superior Court,* 46 Cal.2d 3, 9-11 [291 P.2d 929].)

 Appellant asserts that the admission into evidence of the confession deprived him of his rights under the Fourteenth Amendment to the Constitution of the United States. He bases this contention upon the fact that the confession was made after his arrest and before he had been taken before a committing magistrate, there being opportunity so to do, and without his being advised of his right to counsel, and that his statements might be used against him.

 There can be no doubt that where a confession is coerced either through threats, force, violence or psychological coercion through constant and prolonged questioning, the defendant is deprived of his constitutional rights, if the confession is received in evidence, but the fact that the confession was received while the defendant was under arrest and prior to the time he had been taken before the committing magistrate, does not, in and of itself, establish coercion. (*Lisenba* v. *California*, 314 U.S. 219 [62 S.Ct. 280, 86 L.Ed. 166 at 179-180] ; *Rogers* v. *Superior Court*, 46 Cal.2d 3 at 9-11 [291 P.2d 929] ; *People* v. *Bashor*, 48 Cal.2d 763 at 765 [312 P.2d 255].)

 There is nothing in the evidence here to show that appellant's confession was coerced, and as a matter of fact, appellant did not so assert, but to the contrary, denied the confession. We do not have here any evidence of any threats against the appellant, any force or violence used upon him, any prolonged questioning of him. We do not have a defendant weakened by prolonged confinement or constant questioning or one of impaired mentality, but on the contrary, a man of high intelligence, experienced in the affairs of life, whose confession was made within 30 minutes after his arrest and without any questions being propounded to him, other than whether the statements made by another which established his guilt, were true. It cannot be said, as a matter of law, that his confession was coerced, and while, as we have said, the fact that he was under restraint at the time of the confession is a fact to be considered in determining whether it was voluntary, his confinement does not establish the fact that it was not.

Appellant asserts, however, that the mere fact that his confession was obtained before he had been arraigned or advised of his constitutional rights, in and of itself makes the confession inadmissible irrespective of whether his constitutional rights were invaded. He bases this contention upon the rule laid down by the Supreme Court of the United States in *McNabb* v. *United States*, 318 U.S. 332 [63 S.Ct. 608,

87 L.Ed. 819]; *Upshaw* v. *United States,* 335 U.S. 410 [69 S.Ct. 170, 93 L.Ed. 100]; *Mallory* v. *United States,* 354 U.S. 449 [77 S.Ct. 1356, 1 L.Ed.2d 1479].) The rules laid down by these cases are applicable only in a federal court and they do not purport to establish any constitutional limitation upon the right of the state courts to receive voluntary confessions made during the time that a defendant may be illegally detained. The Supreme Court of this state has expressly refused to adopt the rule laid down by the United States Supreme Court as an exclusionary rule in this state. (See *Rogers* v. *Superior Court,* 46 Cal.2d 3 at 10 [291 P.2d 929]; *People* v. *Bashor,* 48 Cal.2d 763 at 765 [312 P.2d 255].)

We hold, therefore, that the court did not err in denying the motion to strike the testimony of the witness Borders. His testimony that the appellant admitted the truth of the statements made by Weiss, was properly received as evidence of a confession of the crime of conspiracy charged by the first count of the indictment, and as an admission of the facts stated by Weiss insofar as they were pertinent to the proof of the crime charged in the second count of the indictment.

Appellant asserts that he was compelled to be a witness against himself. He bases this assertion upon the fact that during cross-examination he was asked if the name "Claude Wilson, known as Woody Wilson" had been mentioned in his presence during the relation by Weiss in the chief's office, to which the appellant over his objection answered: "I'm not sure."

The appellant on direct examination had testified that he was present and listened to Weiss' recitation in the chief's office; and that he had at several times interrupted to deny Weiss' statements and had denied that he was asked if Weiss' statement was true or that he replied: "Yes, it was a stupid thing." The question asked concerning Woody Wilson was proper cross-examination inasmuch as the witness Borders had testified that during the conference in the chief of police's office that Weiss had related Wilson's connection with the conspiracy. But in any event, appellant was not prejudiced by the question or his answer thereto, as the evidence offered by him showed that appellant had had business connections with Claude Wilson.

It is asserted that the evidence fails to show that any claim was filed by appellant against the insurers under the policies of insurance issued by them, and that, therefore,

there was no proof of the commission of the offense charged in either count of the indictment. This contention is based upon the claim that the itemized inventory delivered by appellant to Gaebel, the adjustor for all insurers, did not constitute a claim within the meaning of section 556 of the Insurance Code, and that in order for a claim to have been made it was necessary that a sworn proof of loss be filed.

Section 556 of the Insurance Code reads in part as follows: "It is unlawful to:

" (a) Present or cause to be presented any false or fraudulent claim for the payment of a loss under a contract of insurance.

" (b) Prepare, make, or subscribe any writing, with intent to present or use the same, or to allow it to be presented or used in support of any such claim."

The word "claim" is one of common meaning and is defined by Webster's International Dictionary, Second Edition, unabridged, as follows: "To ask for, or seek to obtain, by . . . right, or supposed right; to demand as due." It is to be assumed that the Legislature in using the word "claim" intended it to have its common meaning and intended to proscribe the presentment of any false demand under a policy of insurance irrespective of the form of that demand. Certainly it was not the intent of the Legislature to only proscribe the filing of a false written proof of loss for proofs of loss are made, not as a claim, but in support of a claim, and it is the making of the false proofs of loss which is in part the subject matter of paragraph (b) of section 556.

The purpose of the two paragraphs of the section is apparent. A claim of loss under a policy of insurance might not be false, yet the proof of loss presented in support of the claim be false. For example: Under a policy of fire insurance, the risk insured against, a loss by fire, might have occurred and a claim for some loss and the amount thereof be true, but the proof of loss might assert the loss of property which was not in fact destroyed or damaged by the fire, or falsely state the quality, character or value of the property destroyed. The provisions of a policy of insurance requiring the insured to present sworn proofs of loss, are for the benefit of the insurer and may be waived. (Ins. Code, § 554; *Hutchings* v. *Southwestern Automobile Ins. Co.,* 96 Cal.App. 318 [274 P. 79] ; *Ruffino* v. *Queen Ins. Co.,* 138 Cal.App. 528 [33 P.2d 26, 883].) It certainly would not be asserted that if an inventory, such as Exhibit 10, had been filed with an

insurer and the amount of the loss paid without any written proof of loss being filed, the insured could not be charged with grand theft and a violation of section 556 of the Insurance Code, if no loss had in fact occurred. Yet that would be the logical result of holding that the jury could not here find that by the presentment to the insurer of Exhibit 10, the insured intended to make a claim of loss.

That there was ample proof from which the jury might find that a false claim of loss was made is clear. The witness Weiss testified that there was no robbery or theft of furs from appellant's premises on the night of December 27th. Appellant caused to be presented to the insurance companies, People's Exhibit 10, which is an itemized list of more than 280 fur garments, with the value of each, and their total value set forth, and stated to the police that that list was the final list for the insurance company. It is evident that the jury might well find from this evidence that by presenting this itemized list, containing the value of each item of the property described, appellant intended it to be a claim for the payment of a loss under the policies, irrespective of the fact that in order to fix the liability of the insurers under the policies, it would be necessary for him to file a formal and sworn proof of loss in support of the claim.

Appellant also complains that the court did not instruct the jury as to the meaning of the word "claim." A sufficient answer to this claim of error is that the word "claim" is one of common meaning and that the appellant did not request any instruction defining that meaning. (*People* v. *Allen*, 138 Cal.App. 652 at 659 [33 P.2d 77]; *Estate of Nutt*, 181 Cal. 522 at 529 [185 P. 393]; *Lawrence* v. *Pickwick Stages, N.D.*, 68 Cal.App. 494 at 501 [229 P. 885]; *People* v. *Whitson*, 25 Cal.2d 593 [154 P.2d 867]; *People* v. *Klor*, 32 Cal.2d 658 at 662 [197 P.2d 705].

Appellant asserts that the evidence is insufficient to sustain the verdict of guilty on the first count. The basis of his claim as we understand his brief, is that the corpus delicti was not established, that therefore his confession was inadmissible, and that without the confession there was no corroboration of the testimony of the accomplice which was relied upon by the People to establish the fact that there was in fact no theft of appellant's furs. The corpus delicti of count I of the indictment was the conspiracy to commit any one of the three counts mentioned in the indictment: (a) grand theft, (b) attempted grand theft, and (c) filing of false

and fraudulent insurance claims. Appellant asserts that there was no proof of any agreement to commit grand theft or of any agreement between appellant and any of the named conspirators, to file a claim for insurance.[8] It is true that there was no direct evidence of an express agreement between appellant and any of the named conspirators, but direct evidence is not necessary for a conspiracy may be, and often must be established by circumstantial evidence and an express agreement need not be proved, but the conspiracy may be implied from the acts of the conspirators in carrying out a common purpose to an unlawful end. (*People* v. *Daener,* 96 Cal.App.2d 827, 831 [216 P.2d 511]; *People* v. *Curtis,* 106 Cal.App.2d 321, 327 [235 P.2d 51]; *People* v. *Lawrence,* 143 Cal. 148 [76 P. 893, 68 L.R.A. 193].) In the present case, the evidence produced by the People was sufficient to sustain a finding that a robbery was faked by appellant and Weiss on December 27th; that no furs or other property were stolen from appellant; that the appellant called the police through the A.D.T. alarm and notified the insurers of the alleged theft; that appellant thereafter filed a claim against these insurers for his alleged loss in the alleged robbery and that each of these acts was done pursuant to a plan to illegally obtain money from appellant's insurers.

The uncorroborated testimony of the accomplice Weiss, together with the filing of the false claim, were sufficient to establish the corpus delicti. (*People* v. *Goldstein,* 136 Cal. App.2d 778 at 789 [289 P.2d 581]; *People* v. *Briley,* 9 Cal. App.2d 84 at 86 [48 P.2d 734].)

The corpus delicti being established, the confession was admissible in evidence and constituted sufficient corroboration of the accomplice's testimony.[9] (*People* v. *Rokes,* 18 Cal.App. 2d 689 at 691 [64 P.2d 746]; *People* v. *Earl,* 10 Cal.App.2d 163 at 165 [51 P.2d 147].) The testimony of the accomplice, the confession and the evidence as to the filing of the claim against the insurers established not only the conspiracy as charged in the first count of the indictment, but at least two

---

[8]It was also claimed that there is no such crime as conspiracy to attempt grand theft. There is no substance in this claim, for an agreement to commit grand theft necessarily includes conspiracy to attempt the theft.

[9]It was conceded by appellant at oral argument that if the confession was properly received in evidence, it constituted sufficient corroboration of the testimony given by Weiss at the trial. The communication between appellant and Weiss by manual signs at the city jail, was also a fact tending to corroborate Weiss' testimony.

of the overt acts charged by that count, and this evidence amply supports the verdict of guilt upon both counts.

Appellant makes numerous assignments of error in relation to the rulings of the court upon the admissibility of evidence. We have examined all of these assignments of alleged errors and find only one that has substance.

As a part of the People's case it was proved that Exhibit Number 10 (the list of the furs hereinbefore described) had been delivered to Gaebel, the adjustor for the insurance companies, and that appellant stated that that was the final list for the insurance company, and had refused to give the police a copy of it. The People had also shown that this list was received by Gaebel in an envelope which was received into evidence and marked "exhibit no. 11." The appellant called as a witness one of his employees, a Mr. Behar. This witness testified that he had received Exhibit Number 10; that when he received it, it was sealed and was addressed to C. A. Gaebel. When asked what he did with it he replied: "I was instructed to give it to Mr. Gaebel for the police to check." The district attorney then moved to strike the answer as not responsive and as containing hearsay, whereupon counsel for the appellant offered to prove by the witness that Exhibit Number 11 was handed to the witness by the appellant who told the witness to deliver it to Mr. Gaebel, "that it was a list for the police and that Mr. Gaebel had asked for it and he was to give it to him as soon as possible." The district attorney's objection to this offer was sustained and the answer of the witness was stricken.

While the motion to strike the answer was proper, as the answer was not responsive to the question asked, the court's ruling on the offer of proof was clearly erroneous. The gist of the crime charged by the second count of the indictment was the filing of a false claim. It was the claim of the prosecution that Exhibit Number 10 constituted the false claim. It did not, however, contain any expressed demand for the payment of the loss and unless the appellant intended it as a demand or an assertion of a right to payment, there would be a failure of proof under count II of the indictment. His intent to make a demand might, as the People claim, be inferred from the filing of the claim and other evidence which we will later advert to. The appellant, however, was entitled to show a different intent and to offer proof of any statements made by him in connection with the delivery of the document which might tend to prove the absence of the intent to make a claim.

Such statements were verbal acts within the exception to the rule against hearsay. (*People* v. *Weatherford*, 27 Cal.2d 401 at 421-422 [164 P.2d 753]; *People* v. *Chenault*, 74 Cal.App.2d 487 [169 P.2d 29]; Wigmore VI, §§ 1725, 1732, 1772-1777, 1785.)

In view of the record here, however, we are convinced that this error does not justify a reversal of the judgment. The evidence showed without conflict that appellant caused to be prepared and furnished directly to the police, two other lists of the furs lost in the alleged robbery (Exhibits Nos. 6a and 6b); that he had stated to the police that Exhibit Number 10, which did not contain the manufacturer's numbers as to each of the listed furs, as did Exhibits Numbers 6a and 6b, was the final list for the insurance company and that if the police wanted a copy of it they should obtain it from the insurance company. Further, there was no offer to prove that appellant himself or through the witness Behar, informed the insurance adjustor that Exhibit Number 10 was delivered to the insurance company for the use of the police. In the light of these facts it does not seem probable that if the evidence offered through this witness had been received, the jury would have found that no claim was filed by appellant against his insurers. We are satisfied that the error complained of did not result in a miscarriage of justice and is one that falls within section 4½ of article VI of the Constitution.

 During the direct examination of the witness Weiss, he testified as to certain gestures made by appellant while he and appellant were alone in the city jail. The district attorney requested the court to describe the gesture demonstrated by the witness, whereupon the following occurred:

"THE COURT: The witness placed his fourth finger of his right hand across his lips, the sign usually indicating 'Keep quiet.'

"MR. CARR: Well, your Honor, may I interrupt? I object to that; that is a question for the jury to determine. That would indicate many things and I certainly don't think——

"THE COURT: Placing the index finger perpendicularly across the lips, the Court states, has a common meaning, this motion that the witness made.

"MR. CARR: I respectfully assign that as error and ask you to instruct the jury to disregard your remark.

"THE COURT: That assignment is denied."

Appellant urges that the court erred in this ruling and by its statements invaded the province of the jury. We do

not agree. The court did not instruct the jury what interpretation they should place upon the testimony of the witness as to the gesture he demonstrated, but only that the gesture had a common meaning and the truth of that statement is undisputed by appellant.

The lack of substance in this claim of error is demonstrated by the fact that the appellant's own counsel gave to the gesture the same meaning assigned to it by the court.

In cross-examination of the prosecution's witness Borders, the following occurred:

Question by Mr. Carr: "How many times have you seen Mr. Teitelbaum stand up in your presence with his finger to his mouth in this fashion, (indicating) ? . . . I had my finger over my mouth in a 'shushing' fashion."

The court instructed the jury in accordance with CALJIC Number 30 to the effect that if the jury should find that there was an occasion when the appellant, under conditions which fairly afforded him an opportunity to reply, *failed to make a denial* in the face of an accusation directed to him, charging him with the crime or his connection with its commission; that "the circumstance of his silence and *conduct*" might be considered against him as indicating an admission that the accusation thus made was true, and that evidence of such an accusatory statement was not received for the purpose of proving its truth but only to explain the conduct of the accused in the face of it; and unless they should find that his *conduct* at the time indicated an admission that the accusatory statement was true, they should entirely disregard the statement. (Emphasis added.)

Appellant argues that the court erred in giving this instruction because under the evidence given by the prosecution, appellant did not remain silent but expressly admitted the truth of the statements made by Weiss in his presence. We find no merit in this contention. The appellant's admission of the truth of Weiss' statements was certainly a failure to deny its truth and was *conduct* indicating an admission that the accusatory statement was true. It is impossible to see how the appellant could have been, in anywise, prejudiced by the instruction.

The appellant asserts that the court erred in instructing the jury in accordance with CALJIC instruction Number 29 (defining confessions and admissions), Number 29-A (that only a voluntary confession may be considered but

that that rule does not apply to an admission) and 29-B (when a confession is voluntary).

Appellant asserts that these instructions were erroneous in that if the jury believed that appellant admitted the truth of the statements made by Weiss in his presence, his admission constituted a confession and that therefore no question of admission was involved, and it was therefore error for the court to instruct the jury that an admission might be considered even though not voluntarily made. In making his assertion, appellant overlooks the fact that as to count II of the indictment, the admission by the appellant of the truth of Weiss' statement was not a confession but only an admission.

In order for a statement to be a confession, it must admit all of the elements of the crime charged. (*People* v. *Ferdinand,* 194 Cal. 555 at 568-569 [229 P. 341] ; *People* v. *Hall,* 105 Cal.App. 359 [287 P. 533].) The gist of the crime charged by count II was the filing of a false claim or the preparation of a paper to support a false claim. The statements made by Weiss, the truth of which were admitted by appellant, contained nothing as to a filing of any claim by the appellant, or the preparation of any paper in support of a claim and therefore appellant's admission of the truth of Weiss' statement could not constitute a confession as to the crime charged in this count. The court therefore properly charged the jury as to the distinction between confessions and admissions and that an admission might be considered by them even though not voluntary.

The court instructed the jury in accordance with CALJIC Number 821 and Number 826. By the first instruction, the court told the jury a conviction might not be had on the testimony of an accomplice unless it be corroborated by such other evidence as would tend to connect the appellant with the commission of the offense. It defined an accomplice and then stated: "If you should find that any witness in this case so conducted himself in respect to the crime charged, you must find that he was an accomplice." By the second instruction, the court charged the jury that *if* the crime of conspiracy or the crime in violation of section 556 of the Insurance Code charged in the indictment, were committed by any one, that then Weiss was an accomplice as a matter of law.

Appellant attacks these instructions upon two grounds. First he claims they were contradictory. There is no substance in this claim. The first instruction only defined an

accomplice and told the jury that a conviction could not be had upon the testimony of an accomplice unless his testimony was corroborated. The second told them that they must find Weiss to be an accomplice. Read together, they do not leave the question of whether or not Weiss was an accomplice to the determination of the jury and then in conflict therewith, instruct that he was an accomplice, but only tell them that if either crime was committed they must find that he was an accomplice whose testimony must be corroborated.

The second attack made upon the instructions is that by the second instruction the court compelled the jury to find that Weiss was an accomplice and that inasmuch as Weiss was not an accomplice unless he was in appellant's store on December 27, 1955, as to which fact the evidence was in conflict, the court by this instruction invaded the province of the jury. This assertion of error is fanciful to say the least. By no stretch of the imagination can the second instruction be construed as instructing the jury that Weiss was in the appellant's store on December 27, 1955. The court told the jury that if either of the crimes charged in the indictment was committed, then Weiss was an accomplice. Unless Weiss was in the store on December 27, 1955, neither crime was committed and the instruction left it for the jury to determine whether Weiss was in the store and the truth of his testimony as to what there occurred. The instructions were proper and for the benefit of appellant, not his detriment.

■ Appellant further claims that the court erred in defining to the jury the terms "theft" and "grand theft." If we properly interpret appellant's brief, his claim is that these instructions had no application to either of the crimes charged in the indictment or any basis in the evidence produced. This assignment of error is totally without merit. The first count of the indictment charged the appellant with conspiracy to commit grand theft. It was necessary, therefore, for the court to define grand theft to the jury and in so doing to define theft. The evidence offered by the People, and believed by the jury, showed that the object or subject of the conspiracy was to wrongfully and fraudulently obtain money from appellant's insurers by staging a fake robbery and then making a false claim. If the conspirators had accomplished their purposes, they would have been guilty of grand theft.

■ Appellant further charges that the court erred in

defining "attempt" and instructing the jury that a person who conspires to commit grand theft is guilty of a crime, and that a person who conspires to attempt grand theft, is guilty of a crime. Appellant asserts that there is no such crime as conspiracy to attempt grand theft. We do not agree. A conspiracy to commit grand theft is inherently one to attempt that crime. If the conspirators are successful in accomplishing the object of the conspiracy, they have committed grand theft. If they are not successful, they have committed the crime of attempted grand theft.

Appellant makes nine assignments of error based upon the refusal of the court to give instructions requested by him. We have carefully examined the instructions given by the court and are satisfied that the jury was properly instructed on all phases of the law applicable in the case and was fully, fairly and correctly advised as to the kind, quality and degree of proof required for appellant to be convicted on either count of the indictment. This is all that is required. (*People* v. *Steccone*, 36 Cal.2d 234 at 240-241 [223 P.2d 17] ; *People* v. *Hill*, 76 Cal.App.2d 330 at 343, 344 [173 P.2d 26].) Only three of these assigned errors merit further comment by us.

 Appellant requested the court to give the following instruction :

"The only purpose for which you may consider the alleged statements of Clifford Weiss, on the occasion of the meeting in Chief Anderson's office on the morning of February 14, 1956, in the presence of Chief Anderson, Captain Huff, Lt. Borders and Teitelbaum is for the effect of said recital on the defendant Teitelbaum and his reaction thereto. It does not constitute evidence of the truth of said statements. If you find from all the evidence that Teitelbaum did not admit the truth of the statements then made by Weiss but instead said 'It was a lot of Hokum,' or that Teitelbaum denied their truth either by words or conduct or both, then and in such event you must completely and wholly disregard whatever was allegedly said by Weiss on that occasion and the testimony of the witnesses Borders and Huff wherein they recite what Weiss said upon said occasion." This instruction is but explanatory of CALJIC Instruction 30 which was given by the court and which fully stated the law as to the rules which guide the jury in determining the effect of appellant's conduct in relation to an accusatory statement made to him or in his presence. It was not necessary for the court to further state the law to

the jury in different language from that contained in the instruction given. It was not error for the court to deny the requested instruction. (*People* v. *McKenna,* 11 Cal.2d 327 at 337 [79 P.2d 1065]; *People* v. *Stewart,* 109 Cal.App.2d 334 at 343 [240 P.2d 704]; *People* v. *Walker,* 99 Cal.App.2d 238 at 244 [221 P.2d 287]; *People* v. *Shah,* 91 Cal.App.2d 722 at 725 [205 P.2d 1077].)

The appellant requested three instructions to the effect that if circumstantial evidence was susceptible of two interpretations, each of which appeared to be reasonable, and one of which pointed to the guilt of the appellant and the other to his innocence, that it was the duty of the jury to reject the interpretation which pointed to guilt and adopt that which pointed to innocence. While one of the instructions requested by appellant might well have been given, we believe under the circumstances here that the instruction given by the court[10] adequately advised the jury as to the law and that the appellant suffered no prejudice by reason of the denial of his requested instruction. The evidence as to all elements of the crimes charged by the indictment, other than the element of specific intent, were proven by direct rather than circumstantial evidence. If the jury believed, as they evidently did, the testimony of Weiss, there could be no doubt as to the wrongfulness of appellant's intent in staging the faked robbery depicted by Weiss' testimony, and the only evidence bearing upon intent which might be subject to different interpretations, was that having to do with the presentation to the insurers of Exhibit Number 10. The instruction given by the court above noted, sufficiently advised the jury as to their duty in interpreting this evidence and in resolving any conflicting inferences that might be drawn from it. (*People* v. *Yrigoyen,* 45 Cal.2d 46 at 49 [286 P.2d 1]; *People* v. *Bletson,* 117 Cal.App.2d 731 at 734 [256 P.2d 614].)

Appellant requested that the jury be instructed that unless they found beyond a reasonable doubt that appellant admitted the truth of the statements made by Weiss in the conference in the office of the chief of police on February 14th, the jury must return a verdict for acquittal. This in-

---

[10]"I instruct you further, that you are not permitted on circumstantial evidence alone, to find the defendant Teitelbaum guilty of any crime charged against him unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion."

struction contained a correct statement of the law, for the only corroboration of Weiss' testimony was the confession and admission contained in appellant's admission that Weiss' statements, made in the office of the chief, were true. The appellant, however, was not prejudiced by the denial of the requested instruction. The court instructed the jury in accordance with CALJIC Number 821, that a conviction could not be had upon the testimony of an accomplice unless such testimony be corroborated by other evidence which tended to connect the appellant with the commission of the offense; and it instructed the jury in accordance with CALJIC Number 822 as to when the corroboration of an accomplice was sufficient. It instructed them how they were to determine whether corroborative evidence was sufficient, the instruction given being CALJIC Number 830. The court also instructed the jury that the testimony of the accomplice was to be viewed with distrust. Inasmuch as the only evidence offered by the prosecution to corroborate the testimony of Weiss was the admission by the appellant of the truth of Weiss' extrajudicial statements, the jury must have understood from the instructions given that unless they found that appellant made the admission in question, they could not find Weiss' testimony to have been corroborated, and could not convict the appellant.

Appellant urges that the trial court abused its discretion in denying his motion for a new trial. We have carefully examined all of the numerous questions argued under this assignment of error. Most of them have been raised and argued on the appeal from the judgment and have been heretofore dealt with, and the questions not so raised all concern matters which were addressed to the discretion of the trial court. An examination of the record convinces us that the trial court did not abuse its discretion.

The manager and vice president of Teitelbaum Furs, Inc., one Somper, was called as a witness for the appellant. On direct examination he testified among other things to the so-called promotion put on by a New York furrier named Franklin Simon. In connection with this promotion, furs of the value of $14,800 had been taken from the company's Beverly Hills inventory and shipped to Simon and furs of the value of $222,000 had been consigned from the company's New York store to Simon but that these furs had never been carried on the Beverly Hills inventory. On cross-examina-

tion he was asked: "Q. Mr. Somper, are you aware that the Franklin Simon promotion was advertised as the entire stock of Teitelbaum of California, $603,000 . . ." While propounding this question the deputy district attorney had before him on the counsel table a newspaper. Defense counsel objected to the question on the grounds that it called for hearsay and that it was incompetent to prove any issue as against appellant. They also assigned the asking of the question as misconduct and requested the court to direct the jury to disregard it and not to draw any inference from it. The court overruled the objection and the witness answered: "I have seen the add [sic]. I am not certain of the figures, of course."

The court erred in overruling the objection and in refusing the requested admonition to the jury. The district attorney was clearly guilty of misconduct in propounding the question. The answer called for by the question was clearly incompetent for any purpose. An affirmative answer would not serve to impeach any testimony given by the witness and was wholly incompetent to prove that furs of the value stated or any furs had been delivered by the Teitelbaum company to Simon. The district attorney did not claim that he had any evidence of the fact that furs other than those testified to by the witness on direct examination had been delivered or consigned to Simon. His only purpose in asking the question must have been to get before the jury the fact that a New York dealer was offering all of the company's Beverly Hills stock for sale with the hope that they would draw the inference that the allegedly stolen furs had been placed in the hands of Simon without the transaction having been entered on the company's books.

The crux of the entire case was whether the furs for which appellant made claim against his insurance carrier were stolen on the night in question, i.e., did a robbery take place on that night or was there merely a fake robbery. Appellant offered no direct evidence to controvert the testimony of Weiss as corroborated by the confession of the appellant that the alleged robbery was faked and that no furs were stolen. The only witness called by the defense as to the event was the witness Stan. His testimony practically dovetailed with that of Weiss. While the evidence produced by the appellant showed that it was possible for four men to remove 280 fur garments from the vault to a vehicle in the alley within the short period of time that elapsed before the witnesses Lanza

and Walge arrived at appellant's place of business, there was not an iota of evidence that more than one alleged robber was in the store.[11]

From the testimony of the various witnesses who testified as to the racks in the vault being substantially full on December 27, but more than half empty on the 28th, the inference might be drawn that the furs were removed on the night of December 27, but in view of the testimony of Weiss that no furs were removed, whether that inference should be drawn was a question for the jury and if the jury found from the evidence, as they did, that the claimed robbery did not occur then it was entirely immaterial whether the furs claimed to have been stolen were in the hands of Simon or had been otherwise disposed of. Any inference that the jury might have drawn from the question and the answer thereto could not therefore have affected their ultimate verdict.

Other assignments of misconduct are made by appellant. An examination of the record convinces us that there was no misconduct other than that mentioned above; further comment than this would serve no useful purpose.

The order denying appellant's motion for a new trial and the judgment are affirmed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied September 15, 1958, and appellant's petition for a hearing by the Supreme Court was denied October 22, 1958. Carter, J., was of the opinion that the petition should be granted.

---

[11]Counsel for the appellant, in introducing the evidence of Somper as to the time it would require to remove the furs from the vault to the vehicle in the alley and in making a demonstration before the jury, stated in the presence of the jury that the defense would prove that appellant admitted four men into the vault at the time of the robbery. Such evidence was not offered.