596 A.2d 1024

**Ian George Constantine HENRY**

v.

**STATE of Maryland.**

**No. 41, Sept. Term, 1990.**

Court of Appeals of Maryland.

Oct. 11, 1991.

**212**

William H. Murphy, Jr. (Gary S. Bernstein, M. Cristina Gutierrez, Baltimore), on brief, for appellant.

Valerie J. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Gwynn X. Kinsey, Jr., Asst. Atty. Gen., Baltimore), on brief, for appellee.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired, Specially Assigned), MARVIN H. SMITH, Judge of the Court of Appeals (retired, Specially Assigned), JJ.

CHASANOW, Judge.

Ian George Constantine Henry (Henry) was charged and indicted by a Grand Jury for five counts of murder, six counts of use of a handgun in the commission of a crime of violence, and one count each of attempted murder, assault with intent to murder, conspiracy to murder, conspiracy to rob, robbery with a deadly weapon, and theft over $300.00. He was tried in the Circuit Court for Prince George's County and was found guilty by a jury on all counts. On March 14, 1990, a capital sentencing proceeding was conducted before the same judge and jury. The jury returned two sentences of death. The trial judge imposed four additional life sentences (three without the possibility of parole), as well as another 120 years incarceration.

An appeal was taken to this Court pursuant to Maryland Rule 8–306(c). Henry has presented several questions for our review, relating to both the judgments of conviction and

the sentence of death. A brief synopsis of the evidence adduced at trial is necessary.

The critical events that spawned this case occurred on January 22, 1988. In *Bruce v. State*, 318 Md. 706, 569 A.2d 1254 (1990), an appeal by one of Henry's co-defendants, we summarized substantially identical testimony given by the same witnesses that testified in the instant case regarding these events:

"Colleen Grady (Ms. Grady) was with [Kirk Bruce] on January 22, 1988. Ms. Grady overheard part of a telephone conversation while [Bruce] was talking to Ian Henry (Henry). In the conversation, [Bruce] mentioned two briefcases of money, 'the Village in the Woods,' 'Chief,' and 'Donny.' During the conversation Ms. Grady observed [Bruce] point his finger and exclaim 'I will kill him. Boom! Boom!'

Several hours after this conversation occurred, police responded to a call of a shooting and entered an apartment at the Village in the Woods apartment complex in Landover, Maryland. There they found five dead bodies. The body of Leonard Francis, also known as 'Chief,' was found next to his wheel chair in the dining room. Chief had three gunshot wounds including one execution style wound to the side of his head. Lloyd Chambers, also known as 'Donny,' was found in the kitchen dead as a result of six gunshot wounds including one in the back of the head. Next to Donny was the body of Everton Mitchell, who died as the result of a gunshot wound to the back of the head. In a back bedroom, police found the bodies of Carlene Hamilton, also known as 'Donna,' with a gunshot wound to the top of her head, and Richard Williams, also known as 'Ritchie,' with eight gunshot wounds including one to the head. Police officers were met by Charmaine Chambers (Ms. Chambers) who had been shot twice in the head, but was still alive."

*Id.* at 712–13, 569 A.2d 1254, 1257–58.

According to the testimony of Ms. Chambers, she was at the apartment of Leonard "Chief" Francis and Carlene

Hamilton on January 22, 1988. Also present were Carl "Fabulous" Dunstrom, Richard Alexander Williams, Everton Mitchell, Kirk Bruce, Lloyd George "Donny" Chambers, and Henry. While in the back bedroom, Ms. Chambers heard gunfire coming from elsewhere in the apartment. Immediately thereafter, Williams ran into the bedroom in a desperate attempt to escape Henry, who was close behind him, wielding a handgun and firing shots. Ms. Chambers further testified that Henry shot her as well as Williams and Ms. Hamilton. When she fell to the floor, Ms. Chambers attempted to hold her breath, in the hope that her assailants would believe she was dead. This effort proved futile, however, for Dunstrom entered the room, realized Ms. Chambers was alive, and shot her in the neck.

Jacqueline Sellers, Dunstrom's former girlfriend, testified that on January 22, 1988, Dunstrom, Bruce, Eddie Bell (Eddie), and Henry left a residence in Upper Marlboro, Maryland with guns "sometime late in the daytime," saying that "they had business to attend to." Later that evening, Eddie returned and told Ms. Sellers and Michelle Nelson (Bruce's girlfriend) to pack and prepare to leave. Bruce, Dunstrom, and Henry returned, and the group drove to Virginia. Ms. Sellers testified that on the way to Virginia, Henry and Dunstrom discussed the killings, saying that "all of them" were dead. She also stated that Henry had "about four guns" with him and put them on the floor of the car under her feet. The group checked into a motel in Virginia, where the men changed out of blood spattered clothes, put the soiled garments in plastic bags, and later disposed of them. Ms. Sellers further stated that when all of them were together watching television, a report of the "Landover murders" was broadcast on the evening news. When they heard the account, all four of the men began jumping, "dancing around and about, bragging about it," and pretending that they were firing shots. The group later traveled to Florida, stayed for about a week, and separated. Dunstrom and Ms. Sellers went to Brooklyn, New York, where Dunstrom was subsequently arrested.

Ms. Sellers also testified that on several occasions in Virginia and Florida, she saw Henry in possession of a black leather briefcase "full of money."

Robert Williams, the brother of victim Richard Williams (Ritchie), testified that he worked for the drug organization directed by Chief. He stated that on the afternoon before the shootings, he had gone out on an errand for his brother to retrieve approximately $11,000, which he then delivered to Ritchie. He left Chief's apartment around 6:00 p.m. on January 22, 1988. While in the apartment, he had seen a black leather briefcase containing money.

Henry was arrested on April 15, 1988 in the Bronx, New York. FBI Agent Charles Gianturco testified at trial that he had observed a gun on the floor of an open closet, approximately three to four feet away from Henry at the time of the arrest. The weapon was immediately seized. We shall consider Henry's contentions in the order in which they are raised in his brief.

## I. JURY SELECTION

Henry contends that the trial judge erred during *voir dire* by striking from the panel, over Henry's objection, two prospective jurors who answered affirmatively when questioned by the judge as to whether they had any "beliefs about the imposition of the death penalty ... that would make it very difficult ... to serve as a juror in this case in which the death penalty is sought." Henry also asserts that the court improperly excused two other prospective jurors without permitting defense counsel to inquire further into those jurors' ability to apply the law as instructed.

### A. Exclusion of Jurors Deslandes and Rhone

Henry claims that there is nothing in the record to support the trial court's action of excusing prospective jurors Deslandes and Rhone for cause and therefore, Henry's federal and state constitutional rights were violated. Henry maintains that although these two prospective jurors had misgivings about the possible imposition of a death

sentence, each juror's concern would not have " 'prevent[ed] or substantially impair[ed] the performance of his duties as a juror in accordance with his instructions and oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851–52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589 (1980)). We disagree. The statements made by both Deslandes and Rhone indicate that the trial court had sufficient cause to believe the men could not discharge their duties as jurors effectively or impartially.

Prospective juror Deslandes testified as follows:

MR. DESLANDES: I apologize for my bad English. I don't know how to say it, but I have to say something. As a Christian, I'm a Seventh Day Adventist. I don't know how to handle this kind of trial, you know. I don't know how to put God's law in and man in the same bag. It is very hard for me to judge a situation like that.

\* \* \* \* \* \*

THE COURT: All right. Do you think you are just as qualified as all of those people sitting back there to make a decision based on the facts and circumstances?

MR. DESLANDES: I feel confused, you know, I don't know how to handle that.

\* \* \* \* \* \*

THE COURT: ... Let me ask you this. If based on the facts of this case you felt that the evidence in this case warranted the imposition of the death penalty after I explain the law to you in regards to the facts, do you think that you could then impose the death penalty?

MR. DESLANDES: You see I have a conflict.

THE COURT: What is your conflict?

MR. DESLANDES: My conflict is that there was a murder, okay? Someone was killed. Now, to repair that I'm going to kill another?

On the other hand, let the guy be free to kill again? I don't know, it is confusing for me. I don't feel comfortable to face this kind of trial.

\* \* \* \* \* \*

THE COURT: Do you think based on the evidence in this case you could find him guilty or not guilty? Do you have any problem on that?

MR. DESLANDES: I'm not sure.

THE COURT: What problem would you have?

MR. DESLANDES: To understand why, you know.

THE COURT: Finding him guilty or not guilty has nothing to do with the sentence in this case. Do you think you would have any problems?

MR. DESLANDES: Another thing is emotionally I think sometimes I can be biased.

THE COURT: What does that mean?

MR. DESLANDES: You don't know. It is hard to explain.

THE COURT: What does that mean?

MR. DESLANDES: Sometimes I go by emotionally, you know. After that I'm not too sure I did the right decision. ... In this case I'm not sure. I never thought I would one day be serving in this kind of thing. You see my situation? Probably not.

Similarly, prospective juror Rhone indicated that he would not be able to impose a sentence of death.

THE COURT: All right, Mr. Rhone, what do you want to tell me?

MR. RHONE: I don't have a whole lot in the form of explanation, it is just that I don't have a problem with saying yea or nay to guilt or innocence because based on the information I hear. It is just if it comes down to a death sentence I don't believe I could do that. I have never seen where it has solved anything. If it had we wouldn't be here.

I just—the thought of possibly being the 12th person when 11 others are in agreement and I'm the one in

disagreement, and being put in the position to go along for a verdict I just couldn't do that.

THE COURT: Can you think of any case where you could do it?

MR. RHONE: I would have to be totally convinced and I'm not sure that's possible.

THE COURT: Let me ask you this in regards to what you have said. If you were totally convinced based on the facts of this case and the law as I explained it to you that the death penalty should be imposed, could you then impose the death penalty?

MR. RHONE: I don't think so. I just don't see where it served any purpose in the past. Like I said, we wouldn't be here. I'm sorry if that is a lousy explanation.

In *Hunt v. State*, 321 Md. 387, 583 A.2d 218 (1990), we discussed the Supreme Court's determination in *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776, 785, *reh'g denied*, 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968), "that a prospective juror could not be excluded for cause from a case simply because the juror expressed a general objection to the death penalty." *Hunt*, 321 Md. at 414, 583 A.2d at 231. The *Witherspoon* Court further stated that if jurors make it "unmistakably clear that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial," then they may properly be excluded for cause. *Witherspoon*, 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21, 20 L.Ed.2d at 785 n. 21. (Emphasis in original.) The Supreme Court has since modified this holding by refusing to engage in a "ritualistic adherence" to the language of *Witherspoon*. *See Wainwright*, 469 U.S. at 419, 105 S.Ct. at 849, 83 L.Ed.2d at 848. The standard adopted by the Supreme Court is whether the juror's "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 420, 105 S.Ct. at 850, 83 L.Ed.2d at 849 (quoting *Adams v. Texas*, 448 U.S. at 45, 100 S.Ct. at 2526,

65 L.Ed.2d at 589). We acknowledged and applied this standard in *Grandison v. State*, 305 Md. 685, 725, 506 A.2d 580, 600, *cert. denied*, 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986). The result of this application was that the "trial judge's factual determination about the extent of a juror's bias must be given deference," for "the prospective juror's bias need not be proven with unmistakable clarity before the juror could be excused for cause." *Hunt*, 321 Md. at 415, 583 A.2d at 231.

We should give deference to the decision of the trial judge in the instant case. As is evinced by the record, the trial judge asked the two prospective jurors whether they could serve on the jury without bias and whether they could apply the law according to the court's instructions. Juror Deslandes stated that he could be biased and emotional and expressed misgivings as to whether he could determine guilt or innocence in this case. Juror Rhone doubted whether he ever could impose a death sentence. Under these circumstances, we cannot say that the trial judge committed error when he excused these two jurors.

B. Exclusion of Prospective Jurors Lopez and Smith

■ During *voir dire*, the trial judge propounded additional questions to the jurors who had indicated that they would find it "very difficult" to impose the death penalty. Juror Lopez responded that she was opposed to capital punishment "under all circumstances." Thereafter, she was excused. Juror Smith expressed serious reservations about the death penalty and, in response to the judge's question, "Are there any circumstances that you can think of where you might impose the death penalty," she replied, "I can't think of any." When the judge excused Ms. Smith, Henry's counsel objected and sought to rehabilitate the juror by suggesting to the court:

"You can ask the jurors, for example, if they found the people that bombed that Pan Am flight, if they can impose the penalty in that situation, if they could discuss other situations. I think just the category because they

say they can't impose the death penalty doesn't mean under all circumstances. They may admit to the Court that they could then follow the instructions as to the law in this case."

Henry now claims that reversible error was committed by the trial judge. He asserts that it was an abuse of discretion to refuse to permit the defense to rehabilitate Lopez and Smith by additional inquiry into their ability to apply the law as instructed.

We fully discussed the nature of and guidelines for *voir dire* in *Bedford v. State,* 317 Md. 659, 670–75, 566 A.2d 111, 116–19 (1989), and noted that there are no rigid rules governing the inquiry process. *See also Bowers v. State,* 298 Md. 115, 145, 468 A.2d. 101, 117 (1983), *appeal after remand,* 306 Md. 120, 507 A.2d 1072, *cert. denied,* 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986). It is not necessary to duplicate that discussion here. "[T]his Court has determined that the nature and extent of [*voir dire*] lies solely within the sound discretion of the trial judge." *Bedford,* 317 Md. at 670, 566 A.2d at 116–17. Furthermore, Maryland Rule 4–312(d) states that after the court has questioned the potential jurors, it *may* allow the parties to supplement the examination with additional questions. There is no requirement that, once the court has determined that a juror should be excused for cause, it *must* allow a party to continue questioning that juror. In fact,

"the court may frame its own questions and not permit cross-examination by counsel[.] [T]he extent of the examination rests in the sound discretion of the court, and the purpose of the inquiry is to ascertain 'the existence of cause for disqualification and for no other purpose.'"

*Bowers,* 298 Md. at 146, 468 A.2d at 117 (quoting *McGee v. State,* 219 Md. 53, 58–59, 146 A.2d 194, 196 (1959), in turn quoting *Adams v. State,* 200 Md. 133, 140, 88 A.2d 556, 559 (1952)); *Emery v. F.P. Asher, Jr., & Sons, Inc.,* 196 Md. 1, 8, 75 A.2d 333, 336 (1950). Although a defendant has the right to prove a juror is biased, *Dennis v. United States,* 339 U.S. 162, 171–72, 70 S.Ct. 519, 523, 94 L.Ed. 734, 742

(1950), after the judge makes a finding of bias the defendant does not have the right to further examination to attempt to prove that the judge was wrong and the juror was not biased.

■ The trial court did not commit reversible error by refusing to ask Ms. Smith the "Pan Am" question proposed by Henry's counsel.[1] The court may, in its discretion, refuse to ask questions that it deems are speculative or insufficiently tailored to the particular case at issue. *See Bowers*, 298 Md. at 146, 468 A.2d at 117.

Henry seeks to bolster his argument with *Rougeau v. State*, 651 S.W.2d 739 (Tex.Crim.App.1982); however, his confidence is misplaced. In *Rougeau*, the appellate court found that the trial judge had committed reversible error when he excused a juror who had expressed reservations about the death penalty without permitting defense counsel sufficient opportunity to rehabilitate the juror. The juror in *Rougeau*, however, is critically different from jurors Lopez and Smith in the instant case. In *Rougeau*, the juror clearly stated that she could render a verdict according to the law and the evidence presented, even if that resulted in the imposition of a death sentence. *Id.* at 741. Lopez and Smith could make no such statements. The trial court did not abuse its discretion by excusing Ms. Lopez and Ms. Smith from the jury.

## II. HENRY'S ABSENCE FROM SEVERAL BENCH CONFERENCES

Henry next contends that the trial judge denied or "chilled" his right to be present at some bench conferences during trial. He claims that his counsel could not waive his right to be present at the bench conferences and that the trial judge, expressly or impliedly, indicated that Henry was

---

1. Henry's claim that he was entitled to pose the "Pan Am" question to Ms. Lopez probably was not preserved for appellate review, as the request for this question came after Ms. Lopez had been excused from the courtroom.

not welcome at the conferences, thereby effectively chilling "Henry's exercise of the fundamental constitutional right to be present at all critical stages of his trial." By this characterization, we assume Henry is referring to his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as Article 5 of the Maryland Declaration of Rights. Henry claims that his counsel "unequivocally wanted Mr. Henry present with him at bench conferences" and that even if we interpret some of his counsel's actions as constituting a waiver, his counsel did not have the authority to execute such a waiver.

▇▇ Henry had no federal or state constitutional right to be present at bench conferences that were not critical stages of the trial. *See Porter v. State,* 289 Md. 349, 424 A.2d 371 (1981); *Brown v. State,* 272 Md. 450, 325 A.2d 557 (1974). The right of a defendant to be present "has been held not to extend to ... *brief bench conferences with attorneys conducted outside the defendant's hearing,* and to various other conferences characterized as relating only to the resolution of questions of law." (Emphasis added.) W. LaFave and J. Israel, 3 *Criminal Procedure* § 23.2(c) at 3 (1984, 1991 Cum.Supp.). *See People v. Teitelbaum,* 163 Cal.App.2d 184, 329 P.2d 157, 172, (1958), *appeal dismissed, cert. denied,* 359 U.S. 206, 79 S.Ct. 738, 3 L.Ed.2d 759 (1959) (appellant's presence at bench conference would not have been of any aid to his counsel since the topics discussed were questions of law); *State v. Peters,* 146 Mont. 188, 405 P.2d 642, 647 (1965). *See generally* W. LaFave and J. Israel, 3 *Criminal Procedure* § 23.2 (1984 & 1991 Cum. Supp.); Annotation, *Right of Accused to be Present at Suppression Hearing or at Other Hearing or Conference between Court and Attorneys Concerning Evidentiary Questions,* 23 A.L.R.4th 955, 1008–11 (1983).

Henry stresses in his brief that, according to *Hughes v. State,* 288 Md. 216, 421 A.2d 69 (1980), under common law, a defendant has a right to be present at every critical stage of trial and that this right is personal, incapable of being waived by counsel. In *Williams v. State,* 292 Md. 201, 438

A.2d 1301 (1981), however, we modified this common law rule for all future cases.

> "Today, with the complexity of many criminal trials and the absolute right of counsel if there is a danger of incarceration, our system proceeds upon the assumption that it is primarily counsel's function to assert or waive most 'rights' of the defendant. Unless a defendant speaks out, normally he must be bound by the trial decisions, actions and inactions of counsel. Otherwise, the system simply would not work." (Citations omitted.)

*Id.* at 218, 438 A.2d at 1309, *quoted in Noble v. State,* 293 Md. 549, 555, 446 A.2d 844, 847 (1982). We proceeded to revise the rule:

> "[A]n effective waiver of the defendant's right to be present at every stage of the trial will not always require a personal waiver by the defendant. Where the right of confrontation is not implicated, and where there is involved no other right requiring intelligent and knowing action by the defendant himself for an effective waiver, a defendant will ordinarily be bound by the action or inaction of his attorney.

> \* \* \* \* \* \*

> [I]f the defendant himself does not affirmatively ask to be present at such occurrences or does not express an objection at the time, and if his attorney consents to his absence or says nothing regarding the matter, the right to be present will be deemed to have been waived."

*Williams,* 292 Md. at 219–20, 438 A.2d at 1310, *quoted in Noble v. State,* 293 Md. at 556, 446 A.2d at 847.

Maryland Rule 4–231 speaks directly to the issue of presence of the defendant at trial.[2] Under Rule 4–231, a

---

**2.** Rule 4–231 reads in pertinent part:
"(b) Right to Be Present—Exceptions.—A defendant is entitled to be present at a preliminary hearing and every stage of the trial, except (1) at a conference or argument on a question of law....
(c) Waiver of Right to Be Present.—The right to be present under section (b) of this Rule is waived by a defendant: ... (3) who,

defendant does not have a right to be present at a bench conference if the subject matter being discussed is a question of law or if the conference is not considered a "stage of the trial." In addition, a defendant's counsel may, through acquiescence, waive the defendant's right to be present. *Id.*

There were numerous bench conferences throughout the trial, some of which Henry refers to in his brief when discussing the "chilling" of his right to be present at all stages of his trial.[3] Henry, through his counsel and in accordance with Md.Rule 4–231, waived his right to be present at several of the bench conferences. An example of this waiver is illustrated in the following colloquy regarding the anticipated testimony of Ms. Sellers:

> DEFENSE COUNSEL: I think [the State's Attorney] had something to display to the jury. After he does that I would request to come to the bench before the next witness comes up.
>
> THE COURT: Come on up now.
>
> (At the Bench.)
>
> STATE'S ATTORNEY: Do you want your client at these bench conferences?
>
> DEFENSE COUNSEL: *No.*

Similarly, the defense sought to preclude Kenneth Clee from testifying to statements made by the defendant after the murders.

> THE COURT: Come on up, gentlemen.
>
> (At the Bench.)
>
> STATE'S ATTORNEY: Do you want your client up here?
>
> DEFENSE COUNSEL: *No.*

---

*personally or through counsel,* agrees to or acquiesces in being absent." (Emphasis added.)

3. We assume that the bench conferences Henry claims had a "chilling effect" on his rights are those that he specifically enumerated in his brief.

THE COURT: I don't need his client. Why do you keep asking him that?

STATE'S ATTORNEY: I just want to prevent a claim later on that he didn't get to participate in some bench conference that was affecting his rights. As long as they are willing to waive his presence I will stop asking.

THE COURT: Is there some case that says he is entitled to be up here?

STATE'S ATTORNEY: There is a case that says he is entitled to be present at every critical stage of the proceeding.

THE COURT: Anything else?

STATE'S ATTORNEY: I assume a bench conference sometimes falls within that category.

THE COURT: Is there a case that says a bench conference is a critical stage?

STATE'S ATTORNEY: I think there may be, yes.

THE COURT: Is there a case that says *voir dire* —never mind. What do you want?

Henry was specifically invited to be present at some of the bench conferences. For instance, the trial judge expressly directed Henry to approach the bench in order to firmly establish the validity of Henry's election not to testify. The judge concluded his inquiry and the following occurred:

THE COURT: Anything else that you wanted to tell me, Mr. Henry?

[HENRY]: No, Your Honor.

[Apparently counsel and Henry returned to their seats.]

THE COURT: All right, fine. Come on back up now and leave Mr. Henry there.

At this point, the judge had a discussion with counsel concerning jury instructions.

■ On more than one occasion, the trial judge made it clear that he did not want Henry to participate in a particu-

lar bench conference. For example, during the testimony of Ms. Chambers, the following took place:

THE COURT: Come on up.

(At the Bench.)

STATE'S ATTORNEY: Do you want your client up here?

DEFENSE COUNSEL: Yes.

THE COURT: I don't want him up here.

DEFENSE COUNSEL: *That's fine.*

STATE'S ATTORNEY: He waives his presence to be here?

THE COURT: He doesn't have any right to be here, all right? Go ahead.

(Emphasis added.)

Although we do not condone the action of the trial court in making it clear that Henry wasn't welcome at bench conferences, Henry has not demonstrated that the judge committed reversible error. There is no reason why Henry's counsel could not have objected for the record whenever he thought the court was unfairly barring his client from participating in any specific bench conference. Counsel's silence and Henry's acquiescence may be taken as a waiver of any right Henry might have had to participate in the various bench conferences, unless his due process rights required his presence.

The Supreme Court discussed a defendant's due process right to be present in *Kentucky v. Stincer,* 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). The Court explained that

"even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right 'to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' *Snyder v. Massachusetts,* 291 U.S. 97, 105–106, 54 S.Ct. 330, 78 L.Ed. 674 (1934). Although the Court has emphasized that this privilege of presence is not guaranteed 'when presence would be useless, or the benefit but

a shadow,' *id.* at 106–107 [54 S.Ct. at 332–333], due process clearly requires that a defendant be allowed to be present 'to the extent that a fair and just hearing would be thwarted by his absence,' *id.* at 108 [54 S.Ct. at 333]. Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome *if his presence would contribute to the fairness of the procedure."* (Emphasis added.)

*Id.* 482 U.S. at 745, 107 S.Ct. at 2667, 96 L.Ed.2d at 647. *See also United States v. Gagnon,* 470 U.S. 522, 526–27, 105 S.Ct. 1482, 1484–85, 84 L.Ed.2d 486, 490–91 (defendant's absence from judge's in camera discussion with juror held not violative of due process right), *reh'g denied,* 471 U.S. 1112, 105 S.Ct. 2350, 85 L.Ed.2d 865 (1985). In his brief, Henry argues that the court's initial act of barring him from the bench conference improperly "chilled" his right to participate in subsequent bench conferences. He does not argue or establish that his presence at any specific bench conference would have contributed to the fairness of the procedure.[4]

 We caution trial judges not to exclude a defendant from any bench conference where the defendant's presence could contribute to the fairness of the proceedings or from any bench conference that could constitute a critical stage of the proceedings unless the defendant's presence is waived. But we also reiterate what we have previously stated:

"We are fully cognizant of the necessity of conferences between the court and counsel—either before or during a trial—for the purpose of discussing scheduling, other collateral matters of procedure, to hear arguments of law on evidentiary rulings, to confer on proposed instructions to the jury, and the like. Under the authorities herein-

---

4. We express no opinion as to whether, should the record establish that Henry's presence at one or more bench conferences could have contributed to the fairness of the proceedings, this might constitute a basis for post conviction relief for ineffective assistance of appellate counsel.

before cited such conferences have not been held to be a part of the trial. To require that all such conferences be conducted in open court, or that the defendant be present in chambers, or at a bench conference, on each occasion would create administrative burdens, diminish the decorum of the proceedings, and in many instances involve security risks—none of which can be balanced by any gain from the defendant's presence. Trials must, however, not only be fairly conducted but must, to the defendant, give every appearance of so being conducted." (Footnote omitted.)

*Brown v. State,* 272 Md. at 479–80, 325 A.2d at 572–73.

### III. THE STATE'S CLOSING ARGUMENT

Henry asserts that the State improperly implied in its rebuttal closing argument that Henry had "some obligation to provide a 'theory'" on which to base his defense. The State maintains that it was merely rebutting statements made in the defense's closing argument.

Defense counsel related the following in closing argument:

"The possibilities and the theories that you can come up with as a result of that ballistics evidence on that chart is almost endless. That brings me ... to the theory that you heard [the State's Attorney] enunciate a few minutes ago. That theory, ladies and gentlemen, that somehow this man [Henry] was running down the hall with not one gun, not two guns, but three guns, that theory, ladies and gentlemen, is the exact reason why Judge Levin told you, and why most of the lawyers tell you in opening statements that opening statements and closing arguments are not evidence. Because that did not come from that witness stand, and it didn't come from any other physical exhibits that were introduced in this case. That is a theory that can be manufactured out of this evidence just like any other theory, or any other group of theories that you could manufacture out of this evidence.

I can stand here and point out four or five of them but I will not adopt any of them. My point is to show you the uncertainty and the inconclusiveness of the evidence that was presented to you in that ballistics report. That theory holds no more weight than any of the other theories you can come up with, and you can't convict somebody of five counts of first degree murder based on a theory because it may have happened that way."

The prosecutor responded to these comments during rebuttal:

"Ladies and gentlemen, I didn't make up a theory out of thin air and present it about ballistics. [Defense Counsel], if you don't like my theory and you come up with a theory, then let's see how it flies. Let's put our theories before these good people and let them decide. I didn't hear his theory.

I put a theory before you, ladies and gentlemen, based upon the evidence in this case, and I am willing to let you examine it and stand here and stand by it. If you reject my theory, fine, so be it, but I put it up here.

I submit to you that it is based upon the evidence in this case. It is not something that was dreamed up. If they have a theory I'm more than willing to hear it."

At this point, defense counsel objected and the trial court overruled the objection. A cautionary instruction to the jury was neither requested nor given.

The Supreme Court, in *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), discussed the purpose and importance of closing arguments:

"It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the de-

fense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt.

The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." (Citations omitted). *Id.* at 862, 95 S.Ct. at 2555, 45 L.Ed.2d at 600.

 There can be no dispute that during summation, counsel may "state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence."[5] *Wilhelm v. State,* 272 Md. 404, 412, 326 A.2d 707, 714 (1974). Summation provides counsel with an opportunity to creatively mesh the diverse facets of trial, meld the evidence presented with plausible theories, and expose the deficiencies in his or her opponent's argument.

 Although the scope of what may be said in closing is not boundless, "such comment or argument is afforded a wide range." *Id.* There are limits to a prosecutor's creative license,[6] and a trial judge has discretion to set appropriate boundaries. As the Supreme Court recognized in *Herring,*

---

5. When a portion of closing argument in a death penalty case is examined, it must be reviewed in the context of the entire argument and the court's instructions on the law. *Collins v. State,* 318 Md. 269, 279 n. 7, 568 A.2d 1, 5 n. 7, *cert. denied,* ⸺ U.S. ⸺, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990).

6. The American Bar Association recommended specific prosecutorial standards regarding closing argument in 1 *Standards for Criminal Justice* § 3–5.8 (2d ed. 1980), which reads in pertinent part:
"Argument to the jury.
(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
(b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant."

"[t]his is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion."

*Herring,* 422 U.S. at 862, 95 S.Ct. at 2555, 45 L.Ed.2d at 600. The inference of any impropriety occurring in closing arguments "must of necessity rest largely in the control and discretion of the presiding judge and an appellate court should in no case interfere with that judgment unless there has been an *abuse of discretion* by the trial judge of a character likely to have injured the complaining party." (Emphasis in original.) *Wilhelm,* 272 Md. at 413, 326 A.2d at 714–15; *see also Collins v. State,* 318 Md. 269, 279, 568 A.2d 1, 6, *cert. denied,* —— U.S. ——, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990); *Esterline v. State,* 105 Md. 629, 637, 66 A. 269, 272 (1907). *See generally,* F. Celebrezze, *Prosecutorial Misconduct: Quelling the Tide of Improper Comment to the Jury,* 35 Clev.St.L.Rev. 237 (1986–87).

Even when a prosecutor has made an inappropriate remark during summation, a reversal is not automatically warranted. Chief Judge Murphy (then Chief Judge of the Court of Special Appeals) explained in *Reidy v. State,* 8 Md.App. 169, 259 A.2d 66 (1969):

"[T]he fact that a remark made by the prosecutor in argument to the jury was improper does not necessarily compel that the conviction be set aside. 'The Maryland Rule is that unless it appears that the jury were actually misled or were likely to have been misled or influenced to the prejudice of the accused by the remarks of the State's Attorney, reversal of the conviction on this ground would not be justified.' " (Citations omitted.)

*Id.* at 172, 259 A.2d at 67–68, *quoted in Collins,* 318 Md. at 280, 568 A.2d at 6 and *Wilhelm,* 272 Md. at 415–16, 326 A.2d at 716). In determining whether reversible error occurred, an appellate court must take into account "1) the closeness of the case, 2) the centrality of the issue affected by the error, and 3) the steps taken to mitigate the effects of the error." *Collins,* 318 Md. at 280, 568 A.2d at 6.

Henry contends that the State's argument created the impression that the defense had some obligation to prove a "theory" of the case. He complains that "to call upon the defense to provide the jury with its theory of the case is to indicate that the defense carries a burden which the law does not impose." We do not find that the prosecutor suggested that Henry had the burden to prove any element of the charges against him. The court thoroughly instructed the jury on the State's burden of proof and told them that their verdicts should be based on the evidence.

When viewed in its entire context, the prosecution's rebuttal in the instant case does not warrant a finding of reversible error. The State's Attorney was responding directly to remarks made by defense counsel in closing argument and was asking the jury to accept his theory of the case. *See Denny v. State,* 404 So.2d 824, 826 (Fla.App. 1981). The judge properly instructed the jury on the applicable law, including the State's burden of proof. The prosecutor's rebuttal remarks could not have misled or prejudicially influenced the jury.

## IV. REFUSAL TO ALLOW DEFENSE TO CONDUCT DISCOVERY DURING CROSS–EXAMINATION OF STATE'S WITNESS

Henry claims he was prevented from establishing that a "discoverable prior statement of an important witness was in existence." Prosecution witness Robert Williams testified that he was interviewed by a Prince George's County Police detective regarding the murders. During cross-examination, Williams stated that he did not write anything

down during the interview. When defense counsel asked whether the detective took notes during the interview, the prosecutor objected. The court sustained the objection, but the witness nonetheless proceeded to answer in the affirmative. The following bench conference ensued:

DEFENSE COUNSEL: I just want to put a proffer on the record. What I think he would say is that the officer did in fact write down what he was saying, and in fact I think he may say or will say the officer even had him review it from time-to-time. In effect, to make sure that it was accurate.

I just think we need to put on the record at this time that if such statements exist we have never been provided with those statements. I want to put that on the record and make it clear to the Court and enter our objection to that at this time.

THE COURT: All right, fine. It is all on the record. Ask him another question.

STATE'S ATTORNEY: May I put the State's proffer on the record since this is obviously an appellate issue and was raised in the Kirk Bruce case?

The proffer is that the Defense has been provided with all written statements, Grand Jury testimony, prior testimony from the Kirk Bruce trial. I am not aware of any written statements made to the police. Nor am I aware of any statements that he adopted as his own, nor do I have any statements that he signed. What they are talking about are police officer notes. That is my proffer.

THE COURT: It is all on the record. Let's go.

In *Bruce v. State*, we discussed whether the detective's notes taken during this same interview with Robert Williams were discoverable. Williams testified at the Bruce trial that he "may have reviewed and approved portions of the detective's notes," but "did not read, sign, or otherwise adopt or approve all of the detective's notes of the interview." *Bruce*, 318 Md. at 723, 569 A.2d at 1263. We looked to the Jencks Act, 18 U.S.C. § 3500 (1985) for

guidance in determining which prior witness statements must be made available to the defense after a State's witness has testified on direct examination. The Jencks Act defines a discoverable statement as:

"(1) A written statement made by said witness and signed or otherwise adopted or approved by him;

(2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement...."

We found in *Bruce* that the trial judge did not err by declining to oblige the State to furnish the detective's notes to the defense. *Bruce*, 318 Md. at 724, 569 A.2d at 1264.

In the instant case, Henry protested that he was not provided with the same notes taken by the detective during Williams' interview "if such statements exist," and now asserts that he was prevented from determining whether, in fact, there was such a discoverable statement. The State's Attorney said on the record that he was not aware of any written statements made to the police or adopted by Williams as his own. Clearly, if the witness had made prior inconsistent statements to the police and the State's Attorney had been aware of it, an obligation to produce this information may have existed. *Bruce*, 318 Md. at 725, 569 A.2d at 1264; Maryland Rule 4–263(a)(1). However, "[t]he court is not obliged to assist counsel in conducting a fishing expedition during the trial." *Bruce*, 318 Md. at 726, 569 A.2d at 1264. Defense counsel, long before trial, had been furnished with all witnesses' statements. When provided the statements, he neither objected nor asked for additional discovery. If he had any basis for suspecting that there were additional statements made or adopted by the witnesses, he should have requested the notes. Henry's counsel never expressly requested the police notes; he made no demand prior to trial, at the onset of Williams' cross-examination, or even at the bench conference. Henry is not entitled to witness statements until a

demand is made. *See Jones v. State,* 310 Md. 569, 582, 530 A.2d 743, 750 (1987), *vacated and remanded on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988). Henry might also have sought an in camera review of the supposed notes or a hearing outside of the presence of the jury. *See United States v. Hogan,* 763 F.2d 697, 704, *opinion withdrawn in part by,* 771 F.2d 82 (5th Cir.1985) ("The court has a duty to inspect in camera the documents if a timely request is made by the defense and some indication exists in the record that the notes meet the Jencks Act definition of a statement"), *reh'g denied,* 779 F.2d 296 (1986). In the absence of a demand for the notes, Henry was not entitled to go on a "fishing expedition" in the presence of the jury to see if he was improperly denied statements he never even requested.

Statements of witnesses are discoverable for the purpose of impeachment. *Bruce,* 318 Md. at 725, 569 A.2d at 1264. In order to be used for this purpose, the statement must have been signed or adopted by the witness. *Id.; Collins v. State,* 318 Md. at 289, 568 A.2d at 10–11. As we stated in *Collins,* "[w]ithout such ratification, the detective's notes may be classified as his work product, and are not generally discoverable. If the witness has not expressly approved of the statements, it would be unfair for the evidence to be used for impeachment purposes." *Id.* The prosecutor had previously provided Henry with all witness statements. Henry made no objection that he had not been given all witness statements; he at no time made any request to review the notes or to have a hearing outside the presence of the jury. The cross-examination about the detective's notes in the presence of the jury was simply not relevant to any issue that the jury would decide, and the judge was correct in sustaining the objection.

## V. JURY INSTRUCTION ON IMPEACHMENT OF WITNESS THROUGH PRIOR CRIMINAL CONVICTIONS

Henry asked the trial court to instruct the jury on impeachment of credibility through prior convictions. The

requested instruction was 3:22 of the Maryland Criminal Pattern Jury Instructions, which reads, "You have heard evidence that *(insert name of witness)* has been convicted of a crime. You may consider this evidence in deciding whether the witness is telling the truth, but for no other purpose." The court refused to give this instruction. Henry maintains that the evidence supported such an instruction with regard to prosecution witnesses Colleen Grady and Robert Williams, and that the denial of his request constituted prejudicial error. We find the defense did not establish that the witnesses had been convicted of crimes admissible for the purpose of impeachment and consequently, the trial judge did not err.

Under Maryland Code (1974, 1989 Repl.Vol.), Courts & Judicial Proceedings Article, § 10–905(a),

> "*In general.*—Evidence is admissible to prove the interest of a witness in any proceeding, or the fact of his conviction of an infamous crime. Evidence of conviction is not admissible if an appeal is pending, or the time for an appeal has not expired, or the conviction has been reversed, and there has been no retrial or reconviction."

In *Prout v. State*, 311 Md. 348, 535 A.2d 445 (1988), we fully discussed the circumstances of impeachment of witnesses by prior convictions, wherein we stated that infamous crimes (common law felonies and *crimen falsi*) are admissible per se under § 10–905. *Id.* at 360, 535 A.2d at 451. As we have often repeated,

> "[i]t is not required that the evidence (of violations to impeach a witness) be restricted to infamous crimes or those involving moral turpitude on the one hand, but, on the other, the purpose of the admission, to impeach credibility, must impose some limits; the convictions should be of infringements of the law that may have some tendency to impeach credibility, and not all infringements do."

*Prout*, 311 Md. at 361, 535 A.2d at 451, and cases cited therein (quoting *Nelson v. Seiler*, 154 Md. 63, 69, 139 A. 564, 566 (1927)). We refined this rule by declaring that

"to be admissible for impeachment purposes a conviction must be either a felony at common law or a *crimen falsi* and thus infamous, or a lesser crime bearing upon the witness's credibility. Stated another way, crimes, other than those that are infamous, whether misdemeanors or statutory felonies, fall into the class of lesser crimes and may or may not reflect on one's tendency to be truthful."

*Prout,* 311 Md. at 363, 535 A.2d at 452.

According to Maryland Rule 4–325(c), the court when requested "shall[ ] instruct the jury as to the applicable law and the extent to which the instructions are binding." Error results if such an instruction is not given. *Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344, 1348 (1984); *Landsdowne v. State,* 287 Md. 232, 412 A.2d 88 (1980). For the requested instruction to be warranted, Henry would have had to establish that the witnesses had a qualifying conviction. This was not done. During cross-examination, Colleen Grady stated that she had pleaded guilty to cocaine distribution and to possession of a handgun. The State told the court at bench conference, and the defense did not dispute, that Grady had not yet been sentenced on the aforementioned charges. Thus, even assuming that one or both of these crimes could be impeachable offenses, the charges to which Ms. Grady pleaded guilty were not admissible convictions for the purpose of impeachment, as the time for appeal had not yet expired. *See* Md.Code, Courts & Judicial Proceedings Art., § 10–905(a). Henry argues that "Robert Williams testified he had been part of Chief's drug distribution organization, and was incarcerated at the time of trial." Yet, Henry did not establish through evidence that Robert Williams was convicted of a qualified crime. No evidence was adduced at trial that Williams had been convicted of an infamous crime or a crime relevant to the question of credibility. An instruction on impeachment of the witness through prior convictions, therefore, was not warranted.

It is apparent from the record that the testimony about Grady's and Williams' criminal charges was elicited because it was relevant to the issue of whether they were testifying for the State in order to receive some benefit with regard to those criminal charges. The court did grant Henry's request for an instruction that the jury should consider with caution the testimony of any State's witness who had been promised any kind of leniency in exchange for their testimony. The court's instructions on impeachment were sufficient.

## VI. WRITTEN STATEMENT OF WITNESS JEREEN BROWN

State's witness Jereen Brown testified at trial that on January 22, 1988, while she was returning to her apartment in the same building where the murders occurred, she saw two men emerging from the building. The men quickly passed by her and almost knocked her down. When asked whether one of those men was now present in the courtroom, Ms. Brown replied, "I can't remember." She responded identically when asked to give a detailed description of the two men she saw the evening of January 22, 1988. The State's Attorney then attempted to refresh Ms. Brown's memory with a written statement that she had given to police in the early morning hours of January 23, 1988, detailing what she had seen on the night of the murders. She stated that, although her memory was fresh when she originally made the statement to the police, re-reading the statement on the witness stand did not refresh her recollection of the events. Over Henry's objection, the court admitted the statement into evidence. Henry now asserts that the statement was inadmissible hearsay, and its admission into evidence resulted in reversible error. He further contends that since the trial judge admitted this exhibit without considering, or making reference to any hearsay exceptions, its admission is prohibited.

It is an obvious conclusion that Ms. Brown's written statement to the police is hearsay: it was an out-of-court statement offered to prove the truth of the matter asserted.

The crucial question then becomes whether an exception to the hearsay exclusion applies. A writing is admissible under the exception for past recollection recorded if:

"(1) The witness had first-hand knowledge of the matters recorded in the writing;

(2) The witness' present recollection is impaired and cannot be fully refreshed, so that the writing will provide more accurate information than the witness' testimony to present recollection;

(3) The writing was made or adopted by the witness at or near the time of the event recorded;

(4) At that time, the witness or another recorded the facts correctly or the witness recognized as correct the facts recorded."

L. McLain, *Maryland Evidence*, § 803(5).1 at 371–72 (1987) (footnotes omitted). *See Bloodsworth v. State*, 307 Md. 164, 189–92, 512 A.2d 1056, 1069–70 (1986); *see also McCormick on Evidence*, § 299 (E. Cleary 3d ed. 1984). Under this exception, a written recollection is admissible into evidence. *Holcomb v. State*, 307 Md. 457, 464, 515 A.2d 213, 216 (1986).

. Ms. Brown's written statement fulfills the appropriate criteria and is admissible as a past recollection recorded. We find no merit in Henry's assertion that the trial judge erred by not expressly finding that the applicable hearsay exception was satisfied. The statement was clearly admissible, and the judge was correct in his ruling. It was admissible regardless of whether the judge gave no reason or even the wrong reason. "[A] trial court's decision may be correct although for a different reason than relied on by that court." *Robeson v. State*, 285 Md. 498, 502, 403 A.2d 1221 (1979), *cert. denied*, 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1981). No prejudicial error occurred.

### VII. SENTENCE FOR CONSPIRACY TO COMMIT ROBBERY

Henry was convicted of both conspiracy to commit murder and conspiracy to commit robbery. He received a

sentence of life imprisonment for the former and a consecutive ten-year sentence for the latter.

The issue of separate sentences for a single conspiracy was fully discussed in *Jordan v. State*, 323 Md. 151, 591 A.2d 875 (1991) and *Tracy v. State*, 319 Md. 452, 573 A.2d 38 (1990):

> "It is well settled in Maryland that only one sentence can be imposed for a single common law conspiracy no matter how many criminal acts the conspirators have agreed to commit. The unit of prosecution is the agreement or combination rather than each of its criminal objectives. In *Mason v. State*, 302 Md. 434, 445, 488 A.2d 955, 960 (1985), we stated that a 'conspiracy remains one offense regardless of how many repeated violations of the law may have been the object of the conspiracy.' "

*Tracy*, 319 Md. at 459, 573 A.2d at 41, *quoted in Jordan*, 323 at 161, 591 A.2d at 161.

▪ As Henry argues, and the State concedes, the sentence for conspiracy to commit robbery should be vacated. Henry was found to have conspired with others to commit murder and robbery. Of the two, the crime of murder carries the severe penalty. Under Md.Code (1957, 1987 Repl.Vol.) Art. 27, § 38, the severe crime Henry "conspired to commit" was murder, and thus murder is the guideline offense for sentencing purposes. *See Jordan*, 323 Md. at 162, 591 A.2d at 880. The sentence for conspiracy to commit robbery must be vacated.

## VIII. ADMISSION OF CO–DEFENDANTS' STATEMENTS

Ms. Sellers testified at trial that while she was with Dunstrom, Bruce, Eddie, Michelle Nelson and Henry, at a motel in Virginia they "turned on the television, which "flashed" the "Landover murders." At that time, Sellers observed Henry and the other men dancing or jumping up and down, "pretending that they were like firing shots." Bruce and Dunstrom "just kept basically talking about

Landover, and how Chief, you know, was crying for his life...." Henry "was laughing along with them, cheering them on." When the news indicated there was one survivor, Henry became angry with Dunstrom for "not killing the girl, or not finishing up the work."

On appeal Henry contends that the court erred in admitting that portion of Sellers' testimony wherein she related the statements of Bruce and Dunstrom in the Virginia hotel when they heard the news about the murders. He alleges these statements constituted hearsay and did not qualify for admission under the co-conspirator exception to the hearsay rule. Henry claims the event took place after the fulfillment of the object of the conspiracy and that the events Sellers described were "not made in connection with the acts of concealment or disposing of the fruits of the crime." We agree that the statements could not be admitted under the co-conspirator exceptions to the hearsay rule, but Sellers' testimony was, however, properly admitted.

The statements of Bruce and Dunstrom may be considered Henry's tacit admissions, and as such, an exception to the hearsay exclusion. We recently discussed tacit admissions in *Briggeman v. Albert*, 322 Md. 133, 586 A.2d 15 (1991), wherein we stated,

"[a]n admission may be implied through the affirmative conduct or, in the case of 'tacit admissions,' the silence or inaction of a party.... A tacit admission occurs when one remains silent in the face of accusations that, if untrue, would naturally rouse the accused to speak in his or her defense. *Ewell v. State*, 228 Md. 615, 618, 180 A.2d 857, 859 (1962); *McCormick on Evidence* [§ 270 at 799 (E. Cleary, 3d ed. 1984)]; 6 L. McLain, [*Maryland Evidence* § 801(4).3 at 312–13 (1987)]."

*Id.* 322 Md. at 137–38, 586 A.2d at 17.

Professor McLain identified several prerequisites to classifying a statement as a tacit admission:

"A party ... may make a 'tacit admission,' adopting, by his or her silence, another person's statement. In order

for the other's statement to be considered the party's tacit admission, the following prerequisites must be satisfied: (1) the party heard and understood the other person's statement; (2) at the time, the party had an opportunity to respond; (3) under the circumstances, a reasonable person in the party's position, who disagreed with the statement, would have voiced that disagreement. The party must have had first-hand knowledge of the matter addressed in the statement."

6 L. McLain, *Maryland Evidence* § 801(4).3 at 312–13 (1987) (footnotes omitted).

Ms. Sellers testified that while Bruce and Dunstrom talked about the murders and Chief, Henry was "laughing along with them, cheering them on." Thus Henry even went beyond a tacit admission and by his obvious approval, adopted the statements as his own. We find that the trial judge did not commit reversible error by allowing Ms. Sellers' testimony of Henry's adoptive admissions to be admitted into evidence.

## IX. CAPITAL SENTENCING HEARING

Pursuant to Md.Code (1957, 1987 Repl.Vol.) Art. 27, § 412, a capital sentencing hearing was conducted before a jury to determine Henry's sentence for the murders of Richard Williams and Carlene Cassandra Hamilton. The options available to the jury were to choose death, life without the possibility of parole, or life imprisonment for each murder conviction. The jury returned death sentences for both murders. The court subsequently sentenced Henry for the remaining counts. Henry received 15 years for each handgun count in connection with the murders of Hamilton and Williams, and the following consecutive sentences: three sentences of life without the possibility of parole for the first degree murders of Leonard Francis, Lloyd Chambers, and Everton Mitchell; 15 years for each handgun conviction associated with those murders; life imprisonment for the attempted murder of Charmaine Chambers; 15 years for use of a handgun in this attempted

murder; life imprisonment for conspiracy to commit murder; 10 years for conspiracy to commit robbery;[7] 20 years for armed robbery; and 15 years for theft over $300.00.

Henry now claims that the court should have complied with his request to be sentenced on the non-capital convictions before the jury decided the sentence for the capital convictions. Henry alleges that the trial court's action arbitrarily deprived him of a potential mitigating circumstance because if the jurors had been aware that Henry was already sentenced to, *inter alia*, three consecutive life sentences without the possibility of parole, some of them "may have found the necessity for a death sentence far less compelling."

In *Harris v. State*, 312 Md. 225, 539 A.2d 637 (1988), we said that sentences for robbery and use of a handgun imposed, after the original death sentence had been set aside, could have a mitigating effect in the second capital sentencing hearing. *Id.* at 249–51, 539 A.2d at 648–49. We disagree with Henry's interpretation of *Harris*, that sentences for non-capital offenses must always be imposed before death penalty deliberation so the jury may consider the sentences as mitigating factors when determining whether to impose the death penalty. The plain language of Art. 27, §§ 412 and 413 does not suggest that this is a mandatory procedure. Furthermore, in the instant case, the jury had the option to sentence Henry to two sentences of life imprisonment without the possibility of parole. Thus, whether Henry had other life sentences to serve had little relevancy. The jury was well aware that Henry would be sentenced for his non-capital crimes. In fact, defense counsel related to the jury at the capital sentencing hearing that the prosecutor had requested three life sentences without the possibility of parole, and stressed to the jurors that they had the power to sentence Henry to life imprisonment with or without the possibility of parole.

---

7. We vacated the sentence for conspiracy to commit robbery. *See* part VII.

The jurors made their decision in full awareness of the available alternatives.

▮ Henry additionally asserts that the trial judge either neglected to exercise his discretion or, at the very least, abused his discretion on this issue. It is true that when the law requires a trial judge to exercise discretion and he or she fails to do so, error results. *Colter v. State*, 297 Md. 423, 426–28, 466 A.2d 1286, 1288 (1983). The trial judge in the instant case listened to defense counsel's argument and, in his discretion, chose to refuse the defense's request. While it may have been preferable for the court to state the reasons underlying its ruling for the record, it was not necessary in this instance. *See Bruce*, 318 Md. at 722, 569 A.2d at 1262. No reversible error occurred.

## X. HENRY'S ALLOCUTION

### A. Restriction on Length of Allocution

▮ Henry argues that the trial court unreasonably restricted the time of his allocution. When the judge interrupted Henry's allocution, the following colloquy occurred:

THE COURT: All right, Mr. Henry, come up.

(Counsel and the defendant approached the bench and the following ensued):

THE COURT: Mr. Henry, you have been talking for 35 minutes. How much longer will you be?

THE DEFENDANT: Your Honor, I am going to ask you please, Your Honor, to please be understanding with me, Your Honor. You can understand the situation that I believe this is very important that this jury understands some things, Your Honor.

THE COURT: How much longer are you going to be, Mr. Henry?

THE DEFENDANT: I cannot give a rough—Your Honor, I will try to be as short as I possibly can, Your Honor.

THE COURT: Just give me some idea how much longer are you going to be? Five minutes?

THE DEFENDANT: No, Your Honor.

THE COURT: Ten minutes more?

THE DEFENDANT: Maybe just as long as before, Your Honor.

THE COURT: That was 35.

THE DEFENDANT: Maybe just another 35.

THE COURT: All right. Thirty minutes. I am going to tell you that now, and I am not cutting you off because I think in the past 35 minutes what you have said in 35 minutes might have been said in three. I understand your position and everything, and I am not trying to cut you off. Thirty minutes.

THE DEFENDANT: Could I, Your Honor—

THE COURT: Thirty minutes.

A defendant in a capital case must have an opportunity to make a statement before imposition of sentence. *See* Md. Rule 4–343(d).[8] We fully discussed the common law right of allocution and its history in *Harris v. State*, 306 Md. 344, 354–59, 509 A.2d 120, 124–27 (1986) and need not repeat that discussion here. We recognize that affording a defendant the opportunity to allocute "reflect[s] a strong public policy of providing the sentencing body in capital cases with the broadest possible range of relevant information that may counsel leniency." *Id.* at 358, 509 A.2d at 127. Thus, "a defendant who timely asserts his right to allocute, and provides an acceptable proffer, must be afforded a fair opportunity to exercise this right.

\* \* \* \* \* \*

In so holding, we do not suggest that the exercise of this right may be unlimited as to either duration or content. Although a sentencing court may not deny a

---

8. Md.Rule 4–343(d) states:
 "(d) Allocution.—Before sentence is determined, the court shall afford the defendant the opportunity, personally and through counsel, to make a statement."

defendant who elects to allocute a fair opportunity to exercise his right, the court may in its discretion curtail allocution that is irrelevant or unreasonably protracted." *Id.* at 359, 509 A.2d at 127.

The record does not reflect that Henry or his counsel objected to any limit on his right of allocution, nor does it indicate that he did not have full opportunity to say all that he had planned to say. Henry continued his allocution to its conclusion, summed up his position and arguments, and ended by thanking the jury twice. He proceeded with and concluded his argument without any further interruption by the trial judge. Based on the record, we cannot say that Henry was not provided a fair opportunity to exercise his right to allocute.

B. Court's Refusal to Allow Henry to Present Transcript of Grand Jury Testimony to Jury During Allocution

During his allocution, Henry sought to read to the jury a portion of the grand jury transcript wherein a witness identified as "Michelle," who had not testified at trial, contradicted the testimony given at trial by Ms. Sellers. The judge denied Henry's request to present the transcript to the jury. Henry claims that he was deprived of an opportunity to "cast doubt upon his factual guilt," and this resulted in reversible error.

Henry argues that, since a defendant's allocution should be afforded more leeway than counsel's summation, he should have been permitted to use any resources at his disposal to help him establish a mitigating factor for the jury to consider. He attempts to bolster his argument with *Booth v. State*, 306 Md. 172, 507 A.2d 1098, *cert. granted in part*, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986), *judgment vacated in part and remanded by*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), where we stated that "allocution is not limited, in general, to the record in the case, inferences therefrom, and matters of common human experience." *Id.* 306 Md. at 198, 507 A.2d at 1111.

The purpose of a Md.Rule 4–343(d) allocution "is to afford the death penalty eligible, convicted murderer the opportunity to make an unsworn statement in mitigation of the death penalty without being subject to cross-examination." *Booth,* 306 Md. at 198, 507 A.2d at 1111. The rule does not contemplate offering inadmissible evidence during allocution. The right to make a statement about anything mitigating does not include the right to admit documentary evidence after the evidentiary portion of the capital sentencing proceeding has concluded.

In the instant case, the trial judge did not abuse his discretion by denying Henry's request to submit the grand jury testimony to the jury. The State did not call "Michelle" as a witness; thus impeachment by use of her grand jury testimony was improper. Although Henry had a right to insist on presenting his allocution to the jury, he did not have a right to present a transcript of extraneous, out of court statements made by a person who did not testify at trial.

## XI. SENTENCING PHASE INSTRUCTIONS TO JURY

Henry's final contention is that the trial judge committed reversible error by refusing to submit several proposed instructions to the sentencing jury. Whether defense counsel's general objection to the court's failure to propound all of his instructions to the jury preserved the issue for appeal need not be decided, as failure to give the requested instructions did not constitute reversible error.[9]

---

**9.** Md.Rule 4–325(e) is applicable here. The rule states:
"No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object."

The first two proposed instructions that we will discuss read as follows:

*Defendant's Proposed Instruction No. 14A*

"If, after consideration of the facts and circumstances, you are not convinced that the aggravating circumstances found to exist are sufficient in and of themselves to require the penalty of death, you must, in Section III and Section IV of the form, note your conclusions in this regard as a mitigating circumstance which outweighs the aggravating circumstances."

*Defendant's Proposed Instruction No. 9G*

"You must remember that this is a weighing process and not a mere tallying of aggravating and mitigating circumstances. You may well find that a single mitigating circumstance is sufficient to justify a life sentence even if you find more than one aggravating circumstance."

For support Henry cites *Foster v. State,* 304 Md. 439, 474–75, 499 A.2d 1236, 1254 (1985), *reconsidered at* 305 Md. 306, 503 A.2d 1326, *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). Henry asserts that "the insufficiency of the aggravating factors to justify a death sentence may itself constitute a mitigating factor and mandate a life sentence," and therefore, the court was required to present these instructions to the jury.

A similar issue was before us in *Hunt,* where Hunt argued that his proposed instruction was necessary to avoid a mandatory imposition of a death sentence. We stated,

" '[A] trial judge must give a requested instruction that correctly states the applicable law and that has not been fairly covered in instructions actually given.

\* \* \* \* \* \*

In deciding whether the trial court was required to give such an instruction, we must determine whether the requested instruction constitutes a correct statement of the law; whether it is applicable under the facts and

circumstances of this case; and whether it has been fairly covered in the instructions actually given.' "

*Hunt,* 321 Md. at 442–43, 583 A.2d at 245 (quoting *Mack v. State,* 300 Md. at 592, 479 A.2d at 1348).

 The instructions given by the court in the instant case fairly covered the substance of Henry's proposed instruction 14A. The trial judge stated,

"Assuming you find that he was the trigger man and you are convinced beyond a reasonable doubt that he was the trigger man, you go in Section II, and Section II requires the State to prove that what we call in the eyes of the law there are aggravating circumstances that make this murder different from any other murder in which the death penalty is not asked, and there are two aggravating circumstances for you to consider in this case, and you have to deliberate as a jury on each of these two and have to be satisfied beyond a reasonable doubt that one of these aggravating circumstances came about in this case. If you are not convinced beyond a reasonable doubt that either one of these were committed beyond a reasonable doubt, then you mark them not proven, and you put life down. You go to the back and you put life in prison.

\* \* \* \* \* \*

If you are not convinced beyond a reasonable doubt that either one of these aggravating circumstances has been proven, then go to the back and mark life imprisonment with or without parole. If one of them or either one of them have been proven, then go to Section III.

In Section III we are talking about mitigating circumstances. The legislature has said that there are certain things that exist or that you should take into consideration in deciding whether or not the imposition of the death penalty should come about, and they have listed by statute seven specific mitigating circumstances, and added number eight which you as an individual juror can find would be a mitigating circumstance, and when we use the

term mitigating circumstance, and I am going to repeat this to you because that is the crux of what the legislature intended when it passed this death statute, a mitigating circumstance is anything about the defendant or the facts of this case that in fairness or in mercy may make the death sentence an inappropriate penalty for this sentence for the defendant. That is for Mr. Henry. I am going to repeat that again. A mitigating circumstance is anything about the defendant or about the facts of this case that in fairness or in mercy may make the death sentence an inappropriate penalty for this defendant."

■ Similarly, the trial judge did not err by refusing to submit proposed instruction 9G to the jury. He quite thoroughly addressed the substance of the requested instruction in what he actually said:

"After you have made your determination on the mitigating circumstances, you go to the next section of the sentencing form which is Section IV. What you have to do in Section IV is make a determination as to whether or not you are convinced by a preponderance of the evidence that the aggravating circumstances outweigh the mitigating circumstances. That is, you have to be convinced by a preponderance of the evidence that the aggravating circumstances weigh more than the mitigating circumstances, and you are to do that by a preponderance of the evidence.

So what you would do again in this case is put on one side of the scales of justice the aggravating circumstances then you put on the other side of the scales of justice the mitigating circumstances. There is a question that you have to answer, and in order for you to answer ... question ... four yes, that scale has to tip in favor of the aggravating circumstances. If the scale tips in favor of the mitigating circumstances, then you answer question four no.

\* \* \* \* \* \*

In arriving at your decision in this case, you are to consider all the evidence that has been presented to you

by both sides and give it whatever weight you think that it deserves or whatever you think is appropriate. The evidence consists of the testimony that you have heard from witnesses on the witness stand and any other evidence that I have admitted or have been stipulated between the parties.

* * * * * *

You are to consider at this point all the evidence that has been presented by both sides in regards to this phase of the trial, give it whatever weight you think it deserves and as it relates to the sentence or the appropriate sentence in this case.

It is your function as jurors in this phase of this trial in this search for the truth to weigh the evidence, give whatever credence you want to anything that you have heard for the past two days and last month and to render a fair and an impartial verdict."

▆ The jury was properly instructed on the law and how the aggravating and mitigating factors may be weighed. In fact, the jury found two aggravating circumstances and three mitigating circumstances, yet decided that the severity of the aggravating circumstances supported the imposition of the death penalty. Thus, proposed instruction 9G could not have had any significant effect on the deliberations. First, as the jury did not ultimately conclude that there were fewer mitigating circumstances than aggravating ones, the concept in proposed instruction 9G was by its terms inapplicable. Second, the jury demonstrated that it understood in any event that mere numbers of opposing circumstances did not govern the weighing process, as it found that the death penalty was justified despite the lesser number of aggravating circumstances. The trial judge gave instructions that fairly covered both requested instructions 14A and 9G.

▆ Henry also contends that the trial judge erroneously refused to utilize his proposed instructions 2 and 11. Those instructions are:

*Defendant's Proposed Instruction No. 2*

"You must approach your deliberation with the firm understanding that I cannot overrule your decision. Therefore, you are instructed that if you determine that Ian Henry shall be sentenced to death, he will be executed in the manner prescribed by law. Similarly, if you determine that Ian Henry is to be sentenced to life imprisonment, he will spend the balance of his natural life in a penal institution. You are instructed not to make any other presumptions or assumptions with regard to the sentence, other than, again, if the sentence is death it will be carried out in the manner provided by law, and if the sentence is life, that he will serve the balance of his life in a penal institution."

*Defendant's Proposed Instruction No. 11*

"The responsibility for determining whether the death penalty should be imposed rests with you and you alone, and you must act with due regard for the consequences of your decision."

██ Henry claims that the aforementioned two instructions were "designed to forcefully convey to the jurors that their decision was final...." He wanted to emphasize to the jury the critical importance of the impending decision and the serious consequences that would inherently result. A trial judge, when requested, should correctly instruct the jury on every essential point of the law. *See Collins*, 318 Md. at 290, 568 A.2d at 11, where the trial judge properly refused to give jury instructions that were not an accurate statement of the law. To support his argument, Henry cites *Poole v. State*, 290 Md. 114, 125, 428 A.2d 434, 440 (1981). The import of *Poole*, however, was that counsel should not comment to the jury during summation about possible appellate review of a death sentence. This circumstance did not arise in the instant case. The trial judge adequately emphasized the serious nature of the task before the jurors by stating "[Henry] will either receive death or life imprisonment based on your answering these questions in regard to this sentencing proceeding."

Lastly, Henry maintains that the judge was in error when he denied the following requested instructions: *Defendant's Proposed Instruction No. 9*

### C.

"This burden of proof as to the weighing of circumstances operates with respect to each juror individually, and therefore so long as any one of you [perceives] any factor relating to the crime or the defendant which you regard as a mitigating factor that is not outweighed by the aggravating circumstances, you may not return a sentence of death."

\* \* \* \* \* \*

### E.

"If after your careful consideration of the aggravating and mitigating circumstances, you find them to be evenly balanced, the sentence must be life imprisonment."

The trial judge instructed the jury that a death sentence could only be imposed upon a unanimous finding that the aggravating circumstances outweighed the mitigating circumstances; if unanimity could not be reached, then a life sentence was required. As to proposed instruction 9E, the judge told the jury, "If the scale comes out even ... then the State hasn't met its burden of proof, and you mark no." Therefore, we find that the substance of 9C and 9E were fairly covered in the actual instructions given by the judge.

Finally, Henry does not raise the issue, but we are required by Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 414(e)(4) to determine, whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. We conclude that the death penalty is neither excessive nor disproportionate for these brutal drug related murders. *See Huffington v. State,* 304 Md. 559, 500 A.2d 272 (1985), *cert. denied,* 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986), where the death penalty was found neither excessive nor disproportionate for a defendant who murdered two

people and stole money and drugs from the victims. We further conclude that Henry's death sentence was not imposed under the influence of passion, prejudice, or other arbitrary factors. Art. 27, § 414(e)(1).

JUDGMENT AFFIRMED, EXCEPT THE SENTENCE FOR CONSPIRACY TO COMMIT ROBBERY IS VACATED.